[Civ. No. 16840.   First Dist., Div. One.   June 25, 1956.]

E. A. TALIAFERRO, Appellant, v. THE INSURANCE COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

*Assigned by Chairman of Judicial Council.

E. A. Taliaferro, in pro. per., for Appellant.

Edmund G. Brown, Attorney General, Harold B. Haas and Richard S. L. Roddis, Deputy Attorneys General, for Respondents.

WOOD (Fred B.), J.—The petitioner-appellant, doing business in San Pablo under the name of Davis Auto Exchange, is engaged in the dismantling of automobiles, the repair of automobiles, and the sale of new and used parts including parts derived from his dismantling operation.

He brought this proceeding in mandamus, pursuant to the provisions of section 11754.5 of the Insurance Code, to review a decision of the Insurance Commissioner which reclassified portions of his payroll to classifications which called for higher premium rates than those which he had paid to his insurer upon a workmen's compensation insurance policy for the period October 1, 1950, to October 1, 1951.

Upon the record of the proceedings before the Insurance Commissioner, the trial court, exercising its independent judgment on the evidence as set forth in that record, found that the preponderance of the evidence supported the findings of the commissioner "in that dismantling of automobiles was conducted at the petitioner's said premises; that many of petitioner's employees interchanged duties; and that petitioner neither kept nor produced complete and adequate records of remuneration earned by all his employees in detail sufficient to permit a determination of premium for all employees in accordance with the nature of the actual duties performed and contained in the California Workmen's Compensation Manual," and concluded that the record shows that the commissioner proceeded within his jurisdiction, there

was a fair trial, the commissioner did not abuse his discretion, the decision is supported by the findings, and the findings are supported by the evidence.

■ (1) *Petitioner's first contention in support of his appeal to this court* is that the trial court erroneously struck from his petition allegations that the deputy who conducted the hearing on behalf of the commissioner was not qualified to act because he did not possess the qualifications prescribed for a hearing officer by the Administrative Adjudication chapter (Gov. Code, §§ 11500-11528, particularly § 11502) of the Administrative Procedure Act (Gov. Code, §§ 11370-11528).

The answer is that the provisions of that chapter do not apply. Section 11501 of the Government Code states that the procedure of an agency shall be conducted pursuant to said provisions ''only as to those functions to which this chapter is made applicable by the statutes relating to the particular agency.'' The statute which governs the administrative proceeding here involved (Ins. Code, §§ 11750-11758) does not make said chapter applicable to the function of determining payroll classifications under a workmen's compensation insurance policy; emphasized by the fact that it does make said chapter applicable to the function of denying, suspending or revoking a license of an insurer or of a rating organization (Ins. Code, § 11754.4) and adopts by reference certain notice provisions of section 11503 of that chapter (Ins. Code, § 11754.1)

(2) *The portion of the reclassification to which petitioner objects upon this appeal,* is that which assigns the work of certain employees to classification Number 3821,[1] representing $17,576.40 of a total payroll of $26,722.49. Petitioner claims this was not supported by the evidence.

■ This reclassification came about, first, through a test audit conducted by the California Inspection Rating Bureau[2] under authority of Insurance Code, section 11750.3, subd. f, to ''make test audits of insured pay rolls and insurer's audits of such pay rolls to check the accuracy and reliability of such insurer's audits so that charging of premium at approved

---

[1]Described in the 1950 edition of the Workmen's Compensation Insurance Manual as ''Automobile or Automobile Truck Dismantling—including the salvaging or junking of parts, store operations and Chauffeurs and their Helpers.''

[2]This was a rating organization duly licensed pursuant to the provisions of sections 11750-11758 of the Insurance Code.

rates can be assured.'' This resulted in assigning $16,393.94 of the payroll to class Number 3821.

Petitioner then applied to the Rating Bureau for and was granted reconsideration pursuant to section 11753.1 of the code. After a hearing by the bureau the test audit was affirmed.

Petitioner appealed to the Insurance Commissioner from the Rating Bureau's decision (pursuant to § 11753.1). The commissioner, after a hearing, affirmed the bureau's decision as to the $16,393.94 and transferred to Number 3821 an additional $1,182.46 from Number 8389.[3] This resulted in a total of $17,576.40 assigned to Number 3821.

Petitioner directs attention to a portion of the test audit report which, considered alone, seems to indicate that the sum of $6,409.66 was transferred (from Numbers 8046, 8389 and 9015[4]) to Number 3821, and another portion which states that the sum of $6,666.30 was transferred from Number 8046 to Number 3821. He then argues that both items could not be correct and that the two taken together do not account for the $16,393.94. He overlooks the fact that these items were in addition to the amount originally classified as Number 3821 and ignores a portion of the report which lists in five columns under appropriate headings the amount of each employee's salary assigned by the test auditor to one or another of the classifications. This portion shows that he assigned $9,727.64 (including the $6,409.66 above mentioned) to Number 3821, and that he first listed $6,666.30 under Number 8046 and then transferred it to Number 3821, resulting in a total of $16,393.94 assigned to Number 3821.

(3) *Petitioner contends* that because he made quarterly reports during the year and his carrier made an audit of his payroll and accepted premium payments based thereon, the insurance company is estopped, should not be permitted

---

[3]Described in the Manual as ''Automobile or Automobile Truck Repair Shops or Garages—including all engine, mechanical, electrical, body and fender repairing or rebuilding, including Drivers, Chauffeurs and their Helpers.''

[4]Numbers 8046 and 9015 are described in the Manual as follows:

8046. ''Automobile Accessory Stores—retail—N.O.C. [not otherwise classified]—including Salesmen, Drivers, Chauffeurs and their Helpers.''

9015. ''Buildings N.O.C.—Operation by owner or lessee—including care, custody and maintenance of premises, the operation of elevators or heating, lighting or power apparatus; Drivers, Chauffeurs and their Helpers (Maintenance or repair work at any location where such owner or lessee does not also perform janitorial services, operation or maintenance of amusement devices to be separately rated.)''

to bill him for additional premium payments based on a later audit. Such a contention ignores the interest and concern of the state in prescribing and enforcing premium rates appropriate to the risks involved in the various kinds of operations covered by a workmen's compensation insurance policy. ██ It is the duty of the insured employer and of his carrier, alike, to observe these rates. Neither of them acts in his own sole private right. Certainly neither of them can estop the commissioner from enforcing the law and the regulations nor a rating organization from assisting the commissioner in the discharge of that duty.

██ (4) *Petitioner claims that the evidence is insufficient to support the questioned reclassification,* a contention that involves the consideration of certain provisions of the manual, which was adopted by the Insurance Commissioner in the exercise of the authority vested in him by sections 11730-11742 of the Insurance Code. Section 11732 directs the commissioner to "approve or issue, as adequate for all admitted workmen's compensation insurers, a classification of risks and premium rates relating to workmen's compensation insurance." Section 11734 authorizes him to change any such classification. No insurance carrier can issue, renew or carry beyond the next anniversary date any workmen's compensation insurance "at premium rates which are less than the rates approved or issued by the commissioner." (§ 11736.) Penalties for the violation of these requirements are prescribed by sections 11741 and 11742.

Especially significant is paragraph 5 of rule VI of the manual which states that the premium is to be based upon the total remuneration of all officials and employees covered and that "if the employer fails to keep complete and accurate records of the remuneration earned by all officials and employees in sufficient detail to permit the proper determination of premium according to manual rules and to make them available for examination by the carrier, the carrier must apply to the total remuneration earned the premium rate applicable to the highest rated classification describing any part of the work."

In respect to test audits, paragraph 9 of rule VII of the manual provides that "The [California Inspection Rating] Bureau shall have authority to make test audits which shall include: . . . (2) An examination of an employer's entire record of payroll and all other records relating thereto in order to determine the proper amounts and allocation of such

payroll as provided by this Manual. (3) An examination of an employer's records in order to determine the proper allocation of losses to their respective insurance classifications as provided by this Manual.''

There was substantial evidence of interchange of employees from one operation to another and exposure to the hazards of the dismantling operations, which, coupled with the lack of adequate records in sufficient detail to permit determination in accordance with actual duties performed, supports the allocation to Number 3821, ''the highest rated classification describing any portion of the work.''

The test auditor, Charles Hesseltine, testified that while at petitioner's place of business he saw a clerk make sales over the counter in the store, saw a clerk take a man out into the yard and show him around where some used parts were stored in the yard behind the store; and that John Truman, petitioner's office manager (to whom petitioner had referred the witness for information) and petitioner's brother Dave (who was in petitioner's employ) told the witness that such free interchange existed; that he was informed that the men worked in one area or another as needed, a complete interchange of labor, and that all male employees would assist at one time or another in dismantling work; and ''that was basically your [petitioner's] entire operation—was that it was based on the fact that you didn't have enough work to keep one man business [busy] in one particular operation, occupation, all the time, that it was a matter of peak periods where one man could be best transferred from one type of work to another. If they were sitting around doing nothing, they were sent out to help in the parts, as a regular practice.''

There was evidence also that an employee reported as a janitor was injured while taking pins out of pistons; that a salesman was injured when grinding a shaft; and that another salesman fitted wrist pins and faced valves in the machine shop for a short period.

Petitioner does not question that this testimony was given. He points to evidence of an opposite import and in effect asks us to weigh it in his favor. That is not our function. That was done by the commissioner and the trial court in the proper exercise of their respective functions.

As to the inadequacy of petitioner's records, the evidence is clear. At no time did petitioner produce or make available records which showed the specific operations which any employee from time to time or at any given time performed,

although he was requested and given an opportunity to do so by the test auditor, the Rating Bureau, and the Insurance Commissioner. Petitioner's records showed in terms of money the remuneration received by each employee but there was no breakdown to show, for example, when or for how long a salesman or a garage repairman worked at dismantling or otherwise exposed himself to the hazards of the dismantling operations; especially significant in view of the free interchange of labor proven.

These facts, in view of the unmistakably clear mandates declared in the manual, compel the conclusion that the findings and the judgment of the trial court are amply supported.

Petitioner directs particular attention to paragraph 2[5] of rule V of the manual; says that 90 per cent of his payroll goes to employees who conduct his store operations (No. 8046) and only one employee is engaged in dismantling of automobiles (No. 3821); hence, that said paragraph 2 applies and makes Number 8046 the "governing classification." In this, he ignores the segregation of payroll and the keeping of adequate records requirements of paragraph 5 of rule VI, which we have just discussed.

The only California decision which he cites upon this point (*United States Fid. & Guar. Co.* v. *American Bldg. etc. Co.*, 7 Cal.App.2d 683 [46 P.2d 984]) involved a situation which obtained (policy period extending from February 5, 1928, to February 5, 1930) prior to the adoption of the requirements which now appear in paragraph 5 of rule VI of the manual (apparently not adopted until 1931.) Also, it there appeared that the employer's principal business consisted of "Building Maintenance" (which carried the lower premium rate), the manual description of which included "care, custody and maintenance of premises," construed as including "window cleaning" (a class which drew a higher rate), an operation in which a few of the employees were exclusively engaged, representing a payroll of $8,378.77 out of a total payroll of $304,070.17.

Upon determining that, under the circumstances of the case, window cleaning was not a separate enterprise, the court made these significant observations: "It may be, as

[5]Paragraph 2 reads as follows: "The Governing Classification of a risk is defined as that classification, other than the Standard Exception Classifications, which carries the largest amount of payroll exclusive of payroll of miscellaneous employees as defined elsewhere in this section."

pointed out by respondent, that to permit appellants to do all their work under one classification which has a comparatively low rate would work an injustice to other concerns which do window cleaning and nothing else. The latter would obviously take the rating found by the court here. We believe this matter is one for the rate-making authorities to consider, and not the courts." (P. 689.)

In contrast, the requirements of paragraph 5 of rule VI of the manual were applicable during the policy period involved in the instant case and significantly differentiate this case from the American Building Maintenance Company case. We note, also, that here the higher classification includes the lower; Number 3821 includes "store operations," whereas Number 8046 does not include "dismantling."

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied July 25, 1956, and appellant's petition for a hearing by the Supreme Court was denied August 21, 1956.