[Sac. No. 7057. In Bank. July 2, 1959.]

THE STATE BOARD OF EDUCATION, Petitioner, v.
BERT W. LEVIT, as Director of Finance, Respondent.

Stanley Mosk, Attorney General, B. Abbott Goldberg, Assistant Attorney General, Richard L. Mayers and Preble Stolz, Deputy Attorneys General for Petitioner.

A. L. Wirin and Richard W. Petherbridge as Amici Curiae on behalf of Petitioner.

Macklin Fleming for Respondent.

Ralph N. Kleps, Legislative Counsel, Angus C. Morrison, Chief Deputy Legislative Counsel, and Barbara C. Calais, Deputy Legislative Counsel, as Amici Curiae on behalf of Respondent.

SHENK, J.—This is an original proceeding in mandamus. The petitioner, the State Board of Education, is authorized

by the state Constitution to "provide, compile, or cause to be compiled, and adopt, a uniform series of textbooks for use in the day and evening elementary schools throughout the State . . . [and to] cause such textbooks, when adopted, to be printed and published. . . ." (Const., art. IX, § 7.) The respondent is the state executive officer in charge of the Department of Finance. This department is charged by law with the duty of executing promptly all orders for printing received from state agencies[1] and all orders of the State Board of Education for printing must be approved and supervised by the Department of Finance. (Ed. Code, §§ 115, 4801 and 11221.)[2]

The State Board of Education here seeks to compel the respondent to comply with orders to print "Science for Work and Play" and "Science for Here and Now" two elementary school textbooks and their teachers' manuals, published and copyrighted by D. C. Heath and Company. The board alleges that these books were adopted by it on March 6, 1958, for use in grades one and two, respectively, as part of a uniform series of science textbooks for the elementary grades; that it has secured a license to print these books from D. C. Heath and Company, under a contract dated September 15, 1958; that item 435, section 2.2 of the Budget Act of 1958[3] appropriated funds for textbooks; that there is presently an unencumbered balance of $817,009.44 of these funds available to meet the cost of printing these books, and that the respondent has violated the statutory duty imposed on him by Government Code, section 13570, and Education Code, sections 4801 and 11221, in refusing to order the printing of these books.

The respondent originally refused to comply with these

---

[1]Government Code, section 13570. "The department shall execute promptly all orders for printing or binding received from the various State agencies."

[2]Education Code, section 115: "The board [of Education] shall cause the . . . officer having the management of State printing to do any printing required by it. All orders for printing shall first be approved by the Department of Finance."

Education Code, section 4801: "All printing . . . required by . . . the State Board of Education . . . shall be performed by the Department of Finance in the form and manner and at the prices of other State printing, and be paid for in like manner."

Education Code, section 11221: "Subject to the approval of the State Board of Education . . . the Department of Finance shall have supervision of all the mechanical work connected with the printing of such books as may be compiled and adopted. . . ."

[3]Stats. 1958, 2d Ex. Sess., Chap. 1. Budget item 435 of this act will be hereafter referred to as "item 435."

printing orders solely because of the restrictive provision appearing in item 435 which reads: "None of the moneys appropriated by this item shall be expended for publishing, purchasing, shipping, or paying royalties for the books known as 'Science for Work and Play' and 'Science for Here and Now.'" In his return to the alternative writ the respondent took the further position that he has no duty to comply with these orders because the contract with D. C. Heath and Company has not been presented to him for approval and until approved by him it is ineffective under the specific provisions of Government Code, section 13370.[4] He therefore now contends that he has no duty to execute printing orders with respect to a contract which has never become effective because not approved by him, and for which no funds have been appropriated if the restrictive provision of budget item 435 is valid.

The exhibits attached to the petition support the allegation as to the sole ground on which the respondent originally based his refusal to act. The printing orders were presented to respondent's predecessor in office. He returned them to the president of the State Board of Education by letter dated October 30, 1958, which read as follows:

"I am herewith returning to you, unapproved, the printing requisition invoices submitted for the printing of 'Science for Work and Play,' Grade 1; 'Science for Work and Play,' Grade 1, teacher's edition; 'Science for Here and Now,' Grade 2; and 'Science for Here and Now,' Grade 2, teacher's edition; (set forth in printing requisition invoice numbers 729 through 732 inclusive).

"The cost of printing these textbooks was to be charged to item 435 of the Budget Act of 1958. Item 435 provides in part:

"'For publishing, purchasing and shipping free textbooks, Department of Education, in accordance with the following schedule. . . . $9,049,496 . . . None of the moneys appro-

---

[4]Government Code, section 13370. "All contracts entered into by any state agency for (a) the hiring or purchase of equipment, supplies, materials, or of textbooks for use in the day and evening elementary schools of the State . . . are of no effect unless and until approved by the Department of Finance. Every such contract shall be transmitted with all papers, estimates, and recommendations concerning it to the department and, if approved by the department, shall be effective from the date of such approval. This section shall apply to any state agency which by general or specific statute is expressly or impliedly authorized to enter into transactions referred to herein. . . ."

priated by this item shall be expended for publishing, purchasing, shipping, or paying royalties for the books known as "Science for Work and Play" and "Science for Here and Now." '

"Although there are sufficient unencumbered funds in item 435 to meet the cost of publishing these textbooks, I am rejecting the requisitions and directing the state printing office not to proceed with the printing, solely and only because of the provisions in item 435 of the Budget Act prohibiting the publication of these two particular books. Should a court determine that such restriction is invalid I will, of course, immediately direct the state printer to proceed with the work requested.

[Signed] T. H. Mugford<br>Director of Finance."

When the respondent succeeded to the office of Director of Finance he sent the following communication to the attorney general under date of February 2, 1959, referring to

"Subject: Printing Requisition
Invoices Nos. 729-732
'Science for Work and Play,'
'Science for Here and Now.' "

The communication reads as follows:

"Under date of 30 October 1958, my predecessor . . . as Director of Finance, addressed a letter to President William L. Blair of the State Board of Education advising that he was rejecting the above requisitions and directing the State Printing Office not to proceed with the printing because of the provisions in Item 435 of the Budget Act which expressly deny use of the appropriation for the two texts referred to.

"Mr. Goldberg of your office has stated that on direction of the State Board of Education you are about to file a suit to test the validity of the refusal to print these books or, to put it another way, the validity of the restriction contained in the appropriation item. Because of the change in Directors of Finance in the interim, Mr. Goldberg has asked that I address this letter to you stating whether my position on the matter differs from that of my predecessor. The answer is that it does not differ, and that I consider myself bound to comply with the restriction which the Legislature placed in

"While you would normally act as my counsel in connec-
the appropriation item.

tion with litigation involving me in my official capacity, it is my very definite opinion that inasmuch as your office will be filing the suit as attorneys for the State Board of Education or such other plaintiff as may be selected, it would not be proper for my defense to be presented to your office. Therefore, I request your permission to employ counsel to represent me in connection with this contemplated litigation, and would appreciate your written consent to do so pursuant to Section 11040 of the Government Code.

[Signed] Bert W. Levit
Director of Finance.''

Accordingly the respondent is separately represented.

The petition further alleges that the books in question are part of a carefully graded series of science textbooks that have been approved by the board for use in elementary grades one through eight. The board argues that the removal of these books, at legislative discretion, greatly reduces the effective use of the entire series of state approved texts and that if the Legislature, by appropriation restrictions such as budget item 435, may evade the restrictions on its powers imposed by section 7 of article IX of the Constitution there will be created a serious and continuing threat to the entire structure of uniform and coordinated state textbook selection.

This court issued the alternative writ to consider the single issue presented by the petition, namely, the validity of item 435 as measured by the provisions of section 7 of article IX of the Constitution. There appeared to be no other plain, speedy or adequate remedy available to the petitioner to compel the respondent to print these books.

It is contended in the return to the alternative writ that the petitioner's selection of textbooks is in no way affected either by the Legislature's refusal to appropriate funds for these two books in the Budget Act of 1958 or by the respondent's refusal to print them and charge their cost against funds appropriated in item 435. It alleges that the Governor's Budget for the fiscal year 1958-1959, as submitted to the Legislature on February 3, 1958, had recommended the sum of $8,854,711 for printing and royalties for textbooks; that the Legislature thereafter rejected a request made by the board, through the Department of Education, for an augmentation of these funds in the sum of $1,683,839, and that in appropriating the sum recommended in the Governor's Budget

the Legislature had provided that no moneys were thereby appropriated for the publishing of first and second grade science textbooks. These textbooks, the return alleges, were the first supplemental textbooks adopted in science at the first and second grade levels and that they had been adopted on a distribution ratio of one book for each two pupils. The respondent contends that under the Legislature's general powers over the curriculum of the public elementary schools it has a right to refuse to appropriate money for printing and distributing textbooks covering subjects which it has not yet established as part of the curriculum. It also contends that when the Legislature was not able to provide funds for the whole textbook program adopted by the board, the Legislature had a right to determine for which part of the program it would make an appropriation and for which part it would not make an appropriation. The respondent therefore takes the position that he is under no duty to execute printing orders with respect to a contract which has never become effective (Gov. Code, § 13370) and for which no funds have been appropriated.

A replication has been filed by the petitioner in which it is admitted that the contract was neither submitted to nor approved by the respondent. It argues that this contract is one of a class or type which the respondent has excepted from the requirements of section 13370 pursuant to section 13372 of the Government Code. This latter section allows the respondent to "except from this article certain classes or types of contracts of any particular State agency and authorize it to enter into such contracts without submitting them for approval. Written notice of exceptions shall be given to the State agency and the Controller." The replication alleges that there has been a long-standing administrative practice on the part of the petitioner not to submit, and of the respondent not to require formal submission or approval of such contracts, and that the controller has always honored claims based on textbook contracts which he knew had not been formally submitted and approved by the respondent. In view of this administrative practice and the statements made in the respondent's letters of October 30, 1958, and February 2, 1959, some notice should have been given, the petitioner urges, that there would be a change in this practice or that the refusal to honor these printing orders would be also based on the failure to first submit to the respondent for his ap-

proval the contract between the board and the publisher for the plates.

With reference to the original issue, the validity of the restriction in item 435, the replication alleges that this item does not prohibit the publication of science textbooks for the first and second grades but attempts only to prohibit the publication of ''Science for Work and Play'' and ''Science for Here and Now''; that science textbooks have been heretofore adopted and provided for the first and second grades; that the amount requested by the Governor's Budget for the textbook item was calculated on the basis of amounts needed to print and publish an entire series of science textbooks, including science textbooks for the first and second grades; that the two books in question are part of a carefully graded and coordinated set known as the Heath Elementary Series, adopted for use in each of the elementary grades; and that the balance of this series is now being printed by the Printing Division of the Department of Finance out of funds appropriated by item 435. It also alleges that the contract with the publisher for the balance of this series was not submitted to nor formally approved by the respondent.

A brief has been filed in support of the respondent by the Joint Legislative Budget Committee as amicus curiae.[5] This committee was originally created at the 1941 session of the Legislature for the specific purpose of giving the Legislature information upon the basis of which it could exercise greater control over the appropriation of state moneys. It requested permission to appear because of its concern with respect to the issues presented, namely, the validity of item 435 and of Government Code, section 13370. In a series of unpublished opinions the attorney general had held that section 13370 is unconstitutional insofar as textbook contracts are concerned and that they need not be submitted to the respondent for approval.[6] In 1958 conflicting opinions were issued by the attorney general[7] and by the Legislative Counsel[8] as to the validity of item 435. Amicus curiae urge that the provisions

---

[5]The Legislative Counsel was authorized to represent the Joint Legislative Budget Committee as amicus curiae by chapter 114 of the Resolutions of the 1959 Legislature. (A.C.R. 99.)

[6]Atty. Gen. Op. No. 2330 (July 25, 1912); Atty. Gen. Op. No. NS 584 (Sept. 15, 1937); Atty. Gen. Op. No. 584a (Nov. 8, 1937).

[7]Atty. Gen. Op. No. 58/148 (Aug. 4, 1958; 32 Ops. Cal. Atty. Gen. 55).

[8]Opinion of Legislative Counsel, ''Textbook Appropriation #4111'' (Oct. 6, 1958).

of section 13370 of the Government Code and of item 435 of the Budget Act of 1958 may be so interpreted as not to encroach upon the state board's constitutional power of textbook adoption and that the writ should be denied. Other amici curiae also appear.

A novel and important constitutional question is presented, namely, whether the restrictive provision in item 435 of the Budget Act of 1958 constitutes a valid exercise of the legislative power or an invalid encroachment upon the textbook powers given to the State Board of Education by section 7 of article IX of the Constitution. This court is also called upon to determine the validity of section 13370 of the Government Code as applied to textbook contracts and, if that section is applicable, the effect of the failure of the petitioner to submit the contract for approval upon the relief which this court may grant to the petitioner in this proceeding.

The Legislature has itself provided in section 1858 of the Code of Civil Procedure that "In the construction of a statute . . . the office of the judge is simply to ascertain and declare what is in terms or in substance contained thereon, not to insert what has been omitted, or to omit what has been inserted. . . ." Section 1859 requires that "In the construction of a statute the intention of the legislature . . . is to be pursued, if possible. . . ." ▌ All presumptions and intendments are in favor of constitutionality. The general rule is that the invalidity of a legislative act must be clear before it can be declared unconstitutional. (*Johnson* v. *Superior Court,* 50 Cal.2d 693, 696 [329 P.2d 5] ; *State* v. *Industrial Acc. Com.,* 48 Cal.2d 365, 371 [310 P.2d 7] ; *Lundberg* v. *County of Alameda,* 46 Cal.2d 644, 652 [298 P.2d 1].) ▌ Notwithstanding this rule the facts in this case do not warrant upholding the restriction in item 435, and it must be concluded that the respondent should be ordered to disregard the restriction in considering the printing orders which are the subject of this proceeding. No invalidity has been found as to Government Code, section 13370, as hereinafter construed.

Preliminarily, it should be noted that this state operates under the executive budget system pursuant to the Budget Amendments of the Constitution. (Art. IV, § 34, adopted in 1922, amended in 1946, and § 1a, adopted in 1934.) Section 34 of article IV requires the Governor to submit to the Legislature at each regular session of the Legislature a budget containing a complete plan and itemized statement of all proposed expenditures of the state, and to accompany the budget

with an appropriation bill covering the proposed expenditures to be known as the Budget Bill. The Governor may require any board to furnish him with any information which he may deem necessary in connection with the budget. The Legislature is directed to enact all laws necessary or desirable to carry out the purposes of this section and is authorized to enact additional provisions which are therewith not inconsistent. The section specifically provides that ''In case of conflict between this section and any other portion of this Constitution, the provisions of this section shall govern. . . .'' Section 1a of article IV provides that ''Notwithstanding any limitations or restrictions in this Constitution contained, every State . . . board . . . or other agency of the State, whether created by initiative law or otherwise, shall be subject to the regulations and requirements with respect to the filing of claims with the State Controller and the submission, approval and enforcement of budgets prescribed by law.'' Under our system, regular sessions of the Legislature are held in the odd-numbered years. All sessions in even-numbered years are known as budget sessions. Section 2, subdivision (a) of article IV of the Constitution provides that at the budget sessions the Legislature ''shall consider only the Budget Bill for the succeeding fiscal year, revenue acts necessary therefor, the approval or rejection of charters . . . and acts necessary to provide for the expenses of the session.'' The Governor may, ''on extraordinary occasions, convene the Legislature by proclamation, stating the purposes for which he has convened it, and when so convened it shall have no power to legislate on any subjects other than those specified in the proclamation, but may provide for the expenses of the session and other matters incidental thereto.'' (Const., art. V, § 9.) The budget bill in question was first introduced at the regular budget session of 1958. The houses deadlocked and adjourned without the budget bill being passed. It also failed of passage in the First Extraordinary Session. The call for the Second Extraordinary Session of 1958, at which the budget bill was adopted, directed the Legislature ''To consider and act upon the Budget Bill for the succeeding fiscal year and the revenue acts necessary therefor.'' (Sen. Journal, 2d Ex. Sess., March 31, 1958, p. 2.)

The Legislature has given the Department of Finance general powers of supervision over all matters concerning the financial and business policies of the state. (Gov. Code, § 13070.) Every state agency is required to submit to the Department of Finance for approval a complete and detailed

budget at such time and in such form as may be prescribed by the department (Gov. Code, § 13320). Before or after approval, the department may revise, alter, or amend any fiscal year budget, if, in its opinion, revision, alteration or amendment is required in the interest of the state. (Gov. Code, § 13322.) The department may, upon request of a state agency at any time during the fiscal year, authorize transfers between its budget allotments, including reserves. (Gov. Code, § 13323.) When budget items have been approved by the Director of Finance, the Governor's budget is prepared for presentation to the Legislature, pursuant to the requirements of section 34 of article IV of the Constitution.

The State Board of Education is required to submit its estimated textbook cost requirements to the Governor biennially, for inclusion in the Governor's budget (Ed. Code, § 117) and in the Budget Bill as the "Free Textbook Item." Since the 1912 amendment to section 7 of article IX of the Constitution, textbooks adopted by the board are required to be furnished and distributed by the state free of cost to all children attending the public elementary schools. This section provides that these textbooks must be adopted for a minimum period of four years without any change or alteration which will require or necessitate the furnishing of new books to pupils. The Legislature has further prescribed that adoptions shall be made for not less than four nor more than eight years, and that readoptions may be made for a period of not less than one nor more than four years. (Ed. Code, § 11184 [1957 Amendment]; former § 11272, provided adoption and readoption periods of six to eight years.) Because of the limitations of the adoption periods and the continuing nature of the problem of providing textbooks to meet the needs of the public elementary schools, the board makes annual adoptions and submits annual budget requests for an appropriation for printing and royalties for free textbooks. These budget requests are made up considerably in advance of the Governor's budget and are necessarily imprecise, being based on many variables, including the estimated number of pupils, distribution pattern, anticipated adoptions, and estimated printing costs. The board has traditionally deviated from these estimates after the appropriation is made (subject to approval of the Department of Finance as to the availability of funds, Gov. Code, § 13323), frequently publishing more or less books than contemplated, and sometimes printing books that were not included in the original

estimate. The appropriation is requested and made in a lump sum without specific itemization of particular textbooks.

The budget of the Board of Education is submitted to the Director of Finance by the Department of Education, and the textbook appropriation in the budget bill is also made for the department. The appropriation is basically one to a constitutional agency (State Board of Education) although in form it is made to a statutory agency (Department of Education, Ed. Code, § 171). Article IX, section 7 of the Constitution directs the Legislature to provide for a State Board of Education, and itself confers upon that board certain named powers. Section 172 of the Education Code provides that the department shall be administered through (a) the state board, which shall be the governing and policy determining body of the department and (b) the state director of education, in whom all executive and administrative functions of the department are vested and who is the executive officer of the state board. Section 177 provides that the department ''is the successor to, and is vested with all the duties, powers, purposes, responsibilities, and jurisdiction of the State Board of Education. . . .''

█ To the extent that the Education Code authorizes the state board to ''adopt'' textbooks, it is but a restatement and recognition of the power directly conferred upon that board by the Constitution.

In late 1957 the board submitted a budget request for the fiscal year 1958-1959 in the amount of $15,282,733 for estimated printing and royalty costs for free textbooks. At the request of the Department of Finance this request was scaled downward and the sum of $9,854,711 was requested. At that time the board did not know the specific books which it would furnish under the requested appropriation, but it knew that the State Curriculum Commission was studying science texts for use in the elementary schools and that there had been an insistent demand for an improved science program with up-to-date textbooks in the elementary grades. The commission is authorized by the Legislature to study textbooks submitted to the State Board of Education for adoption and to make recommendations to the board (Ed. Code, § 11156) and to recommend specifications for textbooks for uniform use so that the textbooks adopted shall conform to the minimum standard for courses of study. (Ed. Code, § 11155.) The board did not know which books the commission would recommend but it assumed that it would recommend the adoption of a science series for the elementary grades with a distribution pattern of

one book per pupil in each of the eight grades, and that a two-year supply would be furnished. The Department of Finance reduced this second request $1,000,000 by providing, for economy reasons, for a one-year instead of a two-year supply of books. This sum as so reduced, $8,854,711, was the sum recommended in the Governor's budget and was the sum actually appropriated by the Legislature in the Budget Act of 1958, for printing and royalties for free textbooks. This was a lump sum appropriation.

There was no itemization of specific textbooks intended or not intended to be covered by the budget request, and there was no specification of textbooks in item 435 of the Budget Bill other than the express reference in the restrictive provision to ''Science for Work and Play'' and ''Science for Here and Now.'' Section 29 of the Budget Act of 1958 provides that ''For the purpose of further interpreting the meaning of the words . . . used . . . reference is hereby made to that document entitled, 'State of California Budget for the Fiscal Year July 1, 1958, to June 30, 1959,'. . .'' The Governor's budget contained this statement under the heading ''General Analysis'' in item 435: ''This program provides for the publishing and purchasing of textbooks approved by the State Board of Education and distributing them so as to be available to each pupil in the state Public School System. . . . 2 new textbook series are being considered for adoption. The first of the new adoptions is a science series which will be distributed as a basic textbook for grades 7 and 8 and as a supplemental text for grades 1 through 6. The second adoption is a health series. . . . The cost of printing these new series, including royalties, is estimated to be $4,099,800.''

Subsequent to the introduction of the Budget Bill but before it was acted upon, the Curriculum Commission made its recommendations and on March 6, 1958, the board adopted four new series in science, handwriting, health and spelling. The science series adopted is known as the Heath Elementary Series, and is a coordinated series prepared and adopted for grades one through eight as a uniform series. The board adopted a distribution plan of one book per two pupils in grades one through three, with one book per pupil for grades four to eight, for a period of not less than four nor more than eight years. The board then sought to obtain an augmentation of its textbook appropriation from the Legislature. Failing to obtain additional funds in the budget item, the board then reappraised its textbooks requirements, taking into considera-

tion the textbooks adopted since the submission of the Governor's budget, and readjusted its program to provide for those textbooks which in its best educational judgment, should and could be furnished from the limited funds available. In readjusting its program it provided sufficient unencumbered funds in the appropriation to be made by item 435 to cover the costs of printing and royalties for the Heath science series. "Science for Work and Play" and "Science for Here and Now" were adopted for grades one and two as an integral part of this series. As above noted, the original budget contemplated a science series for each grade, although the exact textbooks had not at that time been decided upon.

The restrictive provision which brought about this proceeding did not appear in the Budget Bill as originally introduced at the regular budget session in 1958. It first appeared as a recommendation in a legislative conference committee report at that session but was not adopted. The second and third conference committee reports did not contain the restriction. It appeared in the Budget Bill as introduced at the Second Extraordinary Session as Assembly Bill No. 1. This bill was passed by the Legislature and signed by the Governor.

On September 15, 1958, relying on an opinion of the attorney general that this restrictive provision was void as a legislative encroachment upon the adoption powers of the State Board of Education,[9] the latter entered into two contracts with D. C. Heath and Company, publisher and owner of the copyright, for licenses to print and publish a science series for a period of six to eight years. One contract covered textbooks for grades three through eight. The other covered the two textbooks here involved. Neither of these contracts was submitted to the Department of Finance for approval pursuant to Government Code, section 13370.

It has been a long-standing administrative practice on the part of the board not to submit, and of the Department of Finance not to require submission, of these contracts for approval, and printing orders and claims for royalty costs have been honored by the Department of Finance and the State Controller.[10] Whether this practice stemmed from reliance on

---

[9] 32 Ops. Cal. Atty. Gen. 55, *supra*.

[10] The exhibits include the following: Letter from State Controller's office dated April 20, 1959, advising that that office had not been requiring evidence of Department of Finance approval of contracts entered into by the State Board of Education for payment of royalties on textbook material, and that the practice of that office dates back about twenty

opinions of the attorney general that contracts of this nature were not subject to the provisions of Government Code, section 13370 (Op. Nos. *supra*, 2330 [July 25, 1912]; NS 584 [Sept. 15, 1937]; NS 584a [Nov. 8, 1937]) or whether they were informally approved[11] does not clearly appear. No written exceptions pursuant to Government Code, section 13372, appear to have been made. We are informed by the petitioner that the printing of some textbooks, including the balance of the Heath science series, has been approved by the respondent and is now in progress although the contract with the publisher was not formally submitted to nor approved by the respondent.

■ Substantial compliance with the provisions of sections 13370 and 13372 of the Government Code may be inferred from the prior administrative practice and from the approval inferentially expressed in the respondent's letter of October 30, 1958. This letter states: "Should a court determine that [the restriction in item 435] is invalid I will, of course, immediately direct the state printer to proceed with the work requested." The respondent's insistence upon formal compliance with section 13370 was not communicated to the petitioner until after the alternative writ was issued herein, and, in any event, would have been but a formality in view of the position taken by the respondent as to the effect of item 435.

■ Section 13070 of the Government Code gives to the Department of Finance "general powers of supervision over all matters concerning the financial and business policies of the State. . . ." This court has held that the purpose of legislation such as section 13070 is "to conserve the financial

years. An affidavit from Chief of the Bureau of Textbooks and Publications of the State Department of Education dated April 21, 1959, states that during his 27 years as Chief, these contracts have not been approved or submitted for approval to the State Department of Finance, and that he knows of no instance during that time in which the department has requested submission of such contracts or refused to execute printing requisitions based on such contracts because they had not been approved; also that payment of royalties to publishers has been made with full knowledge and consent of the Department of Finance.

[11]It is noted that section 13370 does not require written approval. Amicus curiae suggests that "Even if no formal approval by the Director of Finance has been given for earlier textbook contracts because of the Attorney General's various opinions on the subjects, those contracts would not be voided by the conclusion suggested here [that the present contract with Heath is ineffective]. Administrative action by the Director of Finance in those cases, as, for example, by ordering the printing of the books, would undoubtedly constitute an informal approval sufficient to sustain contracts for textbooks other than the one involved in this case."

interests of the state, to prevent improvidence, and to control the expenditure of state money by any of the several departments of the state.'' (*State* v. *Brotherhood of R.R. Trainmen,* 37 Cal.2d 412, 422 [232 P.2d 857].) The provisions of section 13370 are imbued with the same purpose and design. As amicus curiae suggests, the Legislature, without intending to interfere with the constitutional function of the State Board of Education in any way, may have thought it necessary for some responsible fiscal officer of the state to approve textbook contracts from the point of view of fiscal soundness only. ■ Review of a contract prior to its effectiveness is a proper requirement to insure that conditions have been met (e.g., Ed. Code, § 11154, cost to be paid from funds specifically appropriated for that purpose; Ed. Code, sections 11157-11158, procedural requirements in the adoption process; Ed. Code, section 11181.1, Gov. Code, sections 13370.1, 13370.2, formalities in bidding). ■ Like other agencies of government the State Board of Education is subject to supervision of its fiscal affairs by the appropriate financial officers of the state, to supervision of its expenditures, and to the control and enforcement of its budgets. (Const., art. IV, §§ 1a, 34.) Approval of textbook contracts required by section 13370 of the Government Code is an appropriate device for carrying out this fiscal control and supervision.

■ The conclusion has been reached that this section can be constitutionally applied to the board's textbook contracts so far as fiscal and related matters are concerned. It is presumed that in exercising the powers of approval given to him by section 13370 of the Government Code the respondent will observe constitutional and statutory limitations appropriate thereto. It would appear that under the circumstances, the petitioner's failure to submit its contract for approval before commencing this proceeding should not operate to its prejudice although, as hereinafter shown by the order of this court, the full relief prayed for may not be granted.

In considering the main issue, namely, the validity of the restrictive provision in item 435, this court is requested to define the scope of the textbook powers of the State Board of Education, as conferred on it by the provisions of section 7 of article IX of the Constitution, and to define the powers of the Legislature both with respect to appropriations and general statutes where the purchase and distribution of textbooks is concerned.

■ Before examining further the provisions of section 7, article IX of the Constitution, it should be noted that the Constitution of 1879 provides in section 22 of article I, as follows: ''The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise.'' As early as January 1881 this court held in *Matter of Maguire,* 57 Cal. 604, at page 609 [40 Am.Rep. 125], as follows: ''The Constitution furnishes a rule for its own construction. That rule is that its provisions are 'mandatory and prohibitory, unless by expressed words they are declared to be otherwise.' (Art. I, § 22.) We find no such express words in the Constitution. This rule is an admonition placed in this the highest of laws in this State, that its requirements are not meaningless, but that what is said is meant, in brief, 'we mean what we say.' Such is the declaration and command of the highest sovereignty among us, the people of this State, in regard to the subject under consideration.'' Thereafter, in 1886, in *Oakland Paving Co.* v. *Hilton,* 69 Cal. 479 [11 P. 3], this section was referred to and at page 512 it was held: ''. . . [U]nder our constitution no question can be made whether the provision in it for its amendment is mandatory or directory. That question is settled by the constitution itself, which ordains in the most solemn form and manner that each and all of its provisions are mandatory and prohibitory, unless by express words declared to be otherwise. (Art. 1, § 22.) This section, in our judgment, not only commands that its provisions shall be obeyed, but that disobedience of them is prohibited. Under the stress of this rule, it is the duty of this court to give effect to every clause and word of the constitution, and to take care that it shall not be frittered away by subtle or refined or ingenious speculation. The people use plain language in their organic law to express their intent in language which cannot be misunderstood, and we must hold that they meant what they said.'' In 1911 this court took judicial notice of the purpose of the framers of the Constitution of 1879 in enacting section 22 of article I and held in *Clark* v. *Los Angeles,* 160 Cal. 30, at page 41 [116 P. 722]: ''Section 22, as is well known, was inserted because of certain previous decisions holding that the provisions of the constitution of 1849 regarding the titles of legislative acts were directory and not mandatory.'' In *People* v. *City of San Buenaventura* (1931), 213 Cal. 637, it was held at pages 639-640 [3 P.2d 3]: ''This declaration applies to all sections

of the Constitution alike, and is binding upon any department of the state government, legislative, executive or judicial. (*People* v. *California Fish Co.*, 166 Cal. 576 [138 P. 79].) In *People* v. *Gunn*, 85 Cal. 238 [24 P. 718], this court followed its decision in an earlier case, and said: 'The language of Judge Cooley in his work on Constitutional Limitations, page 78, quoted and adopted in *State* v. *Rogers*, 10 Nev. 253 [21 Am.Rep. 738], is directly in point, and shows that, even in the absence of a clause making its provisions mandatory and prohibitory, the court will not hold the provisions of a constitution to be directory or unessential, but will rather hold that wherever it prescribes a mode, that mode is the measure of power.' In *Blanchard* v. *Hartwell*, 131 Cal. 263, 264 [265] [63 P. 349, 350] it was again said, 'under such provisions the mode is the measure of the power.' 'Such mode,' said the court, 'is exclusive. Under such constitution this seems indisputable. The one mode . . . is commanded and all others are prohibited.' To the same effect is the decision in *Doran* v. *Foster*, 189 Cal. 610 [209 P. 548]." In *Santa Clara County* v. *Superior Court* (1949), 33 Cal.2d 552, this court again held in no uncertain terms, at page 554 [203 P.2d 1], as follows: "Unquestionably, it must be recognized that our Constitution (art. I, § 22) makes its provisions 'mandatory and prohibitory, unless by express words they are declared to be otherwise'; that this declaration applies to all sections of our Constitution alike, and every one subject to its mandate—county authorities as well as departments of the state government—must comply." The provisions of section 22 of article I are therefore binding upon this court in its construction of the provisions of the Constitution.

A well-known principle of constitutional construction should also be noted. This is stated by Judge Cooley in his treatise on Constitutional Limitations (8th ed. 1927) page 215 as follows: "[S]uch powers as are specially conferred by the constitution upon the governor, or upon any other specified officer, the legislature cannot require or authorize to be performed by any other officer or authority; and from those duties which the constitution requires of him he cannot be excused by law." And again, at page 221, he states this rule: "Those matters which the constitution specifically confides to [a specified body or agency] the legislature cannot directly or indirectly take from his control." This principle has been applied in this state. (See *Laisne* v. *California State Board*

*of Optometry,* 19 Cal.2d 831, 835 [123 P.2d 457] ; *Martello* v. *Superior Court,* 202 Cal. 400 [261 P. 476] ; *Sheehan* v. *Scott,* 145 Cal. 684 [79 P. 350] ; *People* v. *Board of Education of Oakland,* 55 Cal. 331; *People* ex rel. *Smith* v. *Judge Twelfth District,* 17 Cal. 547, 548.)

Also, in arriving at the meaning of a Constitution, consideration must be given to the words employed, giving to every word, clause and sentence their ordinary meaning. If doubts and ambiguities remain then, and only then, are we warranted in seeking elsewhere for aid. (See Cooley, Constitutional Limitations, *supra,* p. 141.) Among these aids is a consideration of the object to be accomplished. In ascertaining this purpose it is proper to examine the proceedings of the convention which framed the instrument. This court takes judicial notice of the controversial background of the ''textbook'' section of the Constitution of 1879 and of the fact that the framers of that Constitution clearly intended to take the question of selection of textbooks from the Legislature.[12] In 1879 this power was given to local authorities. Since 1884 it has been vested in the State Board of Education. It is noted that in 1928 a proposed amendment to section 7 was defeated by the voters which would have provided that the compilation and adoption of textbooks should be under legislative regulation.

The provisions of section 7 of article IX of the Constitution read in pertinent part as follows : ''The Legislature shall provide for the appointment or election of a State Board of Education, and said board shall provide, compile, or cause to be compiled, and adopt, a uniform series of textbooks for use in the day and evening elementary schools throughout the State. The State board may cause such textbooks, when adopted, to be printed and published by the Superintendent of State Printing, at the State Printing Office ; and wherever and however such textbooks may be printed and published, they shall be furnished and distributed by the State free of cost or any charge whatever, to all children attending the day and evening elementary schools of the State, under such conditions as the Legislature shall prescribe. The textbooks, so adopted, shall continue in use not less than four years, without any change or alteration whatsoever which will require or necessitate the furnishing of new books to such pupils, and said State board

[12]See Debates and Proceedings of the Constitutional Convention of 1879, vol. 2, pp. 693, 1107-1108; vol. 3, pp. 1475, 1522.

shall perform such other duties as may be prescribed by law. . . ."

The language employed in the foregoing section is simple and direct and no doubt is left as to the purpose intended. The Constitution does not itself establish the State Board of Education, but it does confer upon that board certain enumerated powers and duties. It also provides that the board "shall perform such other duties as may be prescribed by law." There can be no doubt that it is only the duties other than those enumerated, or necessarily implied from such enumeration, that are made subject to legislative control. If this had not been the intention of the framers of this section and its amendments, and of the people in adopting them, language would have been used such as that appearing in section 25½ of article IV. There the Constitution itself establishes a Fish and Game Commission but provides that "The Legislature may delegate to the commission such powers relating to the protection . . . of fish and game as the Legislature sees fit."

 It must therefore be concluded that the powers given to the state board by section 7 of article IX were intended to be exclusive and to be exercised by no other state agency, including the Legislature.

 The provisions of section 7 are self-executing. It was so held as early as 1880, in *People* v. *Board of Education of Oakland, supra*, 55 Cal. 331, where it was said at page 335: "Possibly the Legislature may prescribe rules by which boards shall be governed in selecting books, viz., to give notice, or to have the matter considered at some meeting called for the purpose, or other rule of machinery merely; but such legislation could not be used to take away the right of *ultimate selection.*" (Emphasis added.)

 The scope of the board's powers under section 7 was forcefully and clearly stated at some length in *Smith* v. *State Board of Control* (1932), 215 Cal. 421 [10 P.2d 736]. It was there said, commencing at page 427: "By the first sentence thereof it is made the duty of the State Board of Education to adopt a uniform series of text-books for the use of the elementary schools of the state. The text-books adopted may either be compiled by the State Board . . . or the board may cause the same to be compiled, or the board may otherwise provide said text-books for use in the elementary department of the school. . . . It may lease the plates from some person . . . that has compiled a suitable text-book, or it may purchase said text-books outright. . . . Whether other methods may or may

464

not be followed is not material, as there is nothing in this section of the Constitution which makes it obligatory upon the board to pursue any particular method. ██ On the other hand, by the plain terms of the section, the board is given the power to provide said text-books in such manner as the board in the judgment of its members may determine. Under this power it has the right to purchase said text-books for the uses and purposes designated in said section.''

██ Amicus curiae suggests that if any ''constitutional sanctity'' attaches to the board's adoption of textbooks, it is limited to those books covered by the language ''a uniform series of textbooks for use'' in the elementary schools, and is therefore limited to those subjects in which the Legislature has prescribed that classes must be given and that textbooks must, or need not, be furnished.[13] However, it does not appear that any such interference with the board's broad power of selection is sanctioned by section 7. The phrase ''uniform series of textbooks for use'' in the schools not only connotes the uniform use of the series adopted (Ed. Code, § 11273) but the use of a uniform or coordinated series of textbooks. It is noted that the textbooks ''Science for Work and Play'' and ''Science for Here and Now'' were adopted by the board as an integral part of a coordinated science series, a uniform series intended for uniform use in each grade and in each public elementary school. ██ Science is not one of the courses of

---

[13]Education Code, section 11151: ''The State Board of Education shall adopt one or more basic textbooks in each of the subjects prescribed for the elementary schools by Section 10302 of this code, except in art and in morals and manners. The board may adopt a single textbook covering two or more of these subjects. The board may adopt other textbooks, supplementary textbooks, and teachers' manuals for use in the elementary schools. The board may adopt teachers' manuals for use in the kindergarten schools. The board shall determine the grade or grades for which each basic textbook, other textbook, supplementary textbooks, and teachers' manual is adopted.

The board shall determine the period for which each basic textbook, other textbook, supplementary textbook, and teachers' manual is adopted, which period shall not be less than four years nor more than eight years. After an original adoption period has expired, the board may extend the adoption period of such books for not less than one year nor more than four years. . . .''

Education Code, section 10302, prescribes that the course of study in the elementary schools ''shall include instruction in the following prescribed branches . . . (a) Reading, (b) writing, (c) spelling, (d) language study, (e) arithmetic, (f) geography, (g) history of the United States and of California, (h) civics . . . (i) music, (j) art, (k) training for healthful living, (l) morals and manners, and such other studies not to exceed three as may be prescribed by the board of education of the city, county, or city and county. . . .''

study prescribed in section 10302 of the Education Code and therefore the board was not required to furnish basic textbooks therein. However, that section authorizes the board to provide basic textbooks in "such other studies not to exceed three as may be prescribed by" local boards and section 11151 authorizes it to provide "other textbooks, supplementary textbooks, and teachers' manuals." Neither at the time "Science for Work and Play" and "Science for Here and Now" were adopted or subsequently has there been put into law any prohibition against teaching science in the first and second grades nor any requirement that if this subject is taught in those grades it should be taught without the use of books.

The facts do not support the contention of the respondent that the books in controversy constitute an augmentation of curriculum. The petitioner points out that there had been prior science textbooks adopted by the state board and distributed by the state as a uniform series of textbooks for use in the elementary grades. With reference to grades one and two, science textbooks had been adopted in May 1943 for a period of six to eight years beginning July 1, 1944. In April 1951 science textbooks were adopted for use in the second grade for a period of six to eight years, beginning July 1, 1952, and this series was readopted on March 6, 1958. It is now being prepared for distribution from funds made available to the board in item 435. This series was adopted on the distribution basis of one book per classroom, while the Heath science series was adopted for a distribution pattern of one book per two pupils in the first and second grades. While there may be a substantial difference in the cost of providing these two science series because of the distribution pattern, this factor would be of importance only if the Legislature cut the amount of the appropriation requested or otherwise properly indicated that its action was prompted by budgetary or curriculum considerations.

The petitioner concedes that the Legislature has the right to determine the curriculum of the public elementary schools and to determine in what courses textbooks shall or shall not be used. It concedes that the Legislature could provide that no textbooks should be furnished for science classes, that science classes should not be taught in grades one and two, or that science classes should not be taught in those grades with textbooks. However, it maintains that if textbooks are to be used they shall be selected by the state board. Its choice of textbooks may be affected by the amount of the appropria-

tion which the Legislature may make, by the form in which the appropriation is made, or by curriculum regulations. However, it argues that the Legislature may not validly interfere with the ultimate selection of textbooks made by the State Board of Education by a restrictive provision such as that contained in item 435.

The restriction in item 435, considered in the light of all the circumstances, was not a curtailment of curriculum but was a prohibition against the particular books named. It therefore violates the prohibitions of section 7 of article IX of the Constitution and must be held invalid.

The declaration that the restrictive provision in item 435 is invalid does not affect the validity of the appropriation itself. The specific provisions of section 37 of the Budget Bill constitute a comprehensive severable clause.

As hereinabove indicated, the respondent originally took the position that he would have no objection to honoring these printing requisitions if the restrictive provision in item 435 were held invalid. In view of the position later taken by him in his return to the alternative writ, namely, that the contract for the license to print the legislatively-proscribed textbooks was not submitted to him for approval and that the contract was not effective until approved by him pursuant to section 13370 of the Government Code, it is deemed advisable not to issue the peremptory writ to the full extent prayed for, and to limit the writ to a consideration of the printing requisition without regard to or consideration of the budget item restriction.

The peremptory writ is ordered to be issued requiring the respondent to consider the printing orders involved without regard to the ineffective restriction contained in item 435 of the Budget Act of 1958.

Gibson, C. J., Traynor, J., Schauer, J., Spence, J., McComb, J., and Peters, J., concurred.

Respondent's petition for a rehearing was denied July 29, 1959.