[No. C013930. Third Dist. May 7, 1993.]

CALIFORNIA RADIOACTIVE MATERIALS MANAGEMENT FORUM et al., Petitioners, v.
DEPARTMENT OF HEALTH SERVICES et al., Respondents;
SENATE RULES COMMITTEE, Real Party in Interest.

844

## Counsel

Graham & James, Paul A. Dezurick, Jennifer L. Herandez, Donald P. Margolis, Baker & McKenzie, Abby B. Silverman, Keith D. Boesky, Sheldon Trubatch, Latham & Watkins, Kimberly M. McCormick, Donna J. Williams, David L. Mulliken, Christopher W. Garrett and Karl S. Lytz for Petitioners.

Pete Wilson, Governor, Janice Rogers Brown, Legal Affairs Secretary, Dale E. Bonner, Deputy Legal Affairs Secretary, Luce, Forward, Hamilton & Scripps, Stephen P. Swinton, Mary L. Walker, Edward Hirshfeld, B. J. Anderson, Grant Woods, Attorney General (Arizona), Charles S. Pierson, Assistant Attorney General, Snell & Wilmer and Richard A. Derevan as Amici Curiae on behalf of Petitioners.

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, Charlton G. Holland III, Assistant Attorney General, John H. Sanders and Paula L. Gibson, Deputy Attorneys General, for Respondents.

Remcho, Johansen & Purcell, Joseph Remcho, Robin B. Johansen, Karen A. Getman, Strumwasser & Woocher, Frederic D. Woocher and Michael J. Strumwasser for Real Party in Interest.

Fred Vendig, Karen L. Tachiki, Victor E. Gleason, D. Robert Shuman, Belvin Kent Smith, Richard J. Chivaro, Allison M. Holdorff, Daniel P. Selmi, Karl Manheim, Robert M. Myers, Robert C. Hight, Best, Best & Krieger, Gene Tanaka, Timothy M. Connor, Patrick H. W. F. Pearce and Cynthia M. Germano as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**SPARKS, J.**—This original writ proceeding arises out of a dispute over an application for a license for the construction and operation of a low-level radioactive waste disposal facility in Ward Valley near the City of Needles in the Southern California desert.[1] The petitioners challenge an order of the Department of Health Services (the department) for administrative proceedings in a formal adjudicatory mode in connection with the application of US Ecology, Inc., (US Ecology) for the license in question. Petitioners are US Ecology and diverse individuals and groups with asserted interests in ensuring the timely construction and operation of the facility.[2] Named as respondents are the department, Dr. Molly J. Coye in her capacity as Director of Health Services, the Health and Welfare Agency, and Russell S. Gould in his capacity as Secretary of the Health and Welfare Agency.[3] The state Senate Rules Committee was designated a real party in interest after we granted its

---

[1] The instant judicial proceedings were commenced when petitioners filed three separate petitions for writs of mandate or prohibition in the Supreme Court, which transferred the petitions to this court. We retained jurisdiction, consolidated the petitions, and issued an alternative writ and stay.

[2] Other petitioners include individuals William H. Otterson, Craig T. Baker, and Todd Dalthorp, each of whom suffers from an illness whose potential cure depends on research which generates low-level radioactive waste, as well as the following groups that have an interest in the timely development of a low-level radioactive waste disposal facility in California: California Radioactive Materials Management Forum; American College of Nuclear Physicians; Society of Nuclear Medicine; and the National Association of Cancer Patients.

[3] The department is one of several departments within the Health and Welfare Agency. (Gov. Code, § 12803.) The Secretary of the Health and Welfare Agency has the power of general supervision over, and is directly responsible to the Governor for, the operations of the department. (Gov. Code, § 12850.)

motion to intervene. Numerous persons and groups have filed amici curiae briefs supporting and opposing the petitions.[4]

The department has already conducted exhaustive administrative proceedings on the pending license application, and has admitted that the proposed adjudicatory proceeding is unnecessary. Nonetheless, the department has notified US Ecology that it must submit to the proposed proceeding before the department will render a decision on its license application. The proposed proceeding would be substantially similar to one conducted under those provisions of the Administrative Procedure Act (hereafter the APA) (Gov. Code, § 11340 et seq.) governing administrative adjudication (Gov. Code, § 11500 et seq.).

Petitioners contend that the order for formal adjudicatory proceedings is the result of unlawful coercion by members of the Senate Rules Committee during the confirmation hearings of Gould and Coye to head the Health and Welfare Agency and the department, respectively. The Senate Rules Committee admits that it obtained an agreement for further administrative proceedings from Gould and Coye during the confirmation process but characterizes the agreement as a legally proper compromise between two branches of government.

We conclude that the Senate Rules Committee's interference in the administration of the law was unconstitutional and the purported agreement with the administrative officers is void. Formal adjudicatory hearings are not otherwise required by law and the respondents have conceded that the void agreement is the only basis upon which they intend to conduct further proceedings. Accordingly, we shall issue a peremptory writ of mandate to require the department to consider US Ecology's license application without regard to the void agreement with the Senate Rules Committee.

### FACTUAL AND PROCEDURAL BACKGROUND

 ██ ██ The genesis of this writ proceeding may be traced to our country's large annual production of low-level radioactive waste and the

---

[4]The parties and amici curiae have produced voluminous submissions together with numerous requests for judicial notice. The issue in this proceeding is narrow in scope and legal in nature. We are not concerned with the wisdom of the acts of the Legislature, the department or the Senate Rules Committee, nor are we concerned with the advisability of selecting Ward Valley as the site or US Ecology as the licensee for the disposal facility. In view of the narrow issue presented, we have denied requests for judicial notice which we regard as unnecessary, irrelevant or redundant. We will, of course, take judicial notice of relevant state and federal statutory, decisional and administrative authorities.

shortage of an adequate number of disposal sites.[5] The problem is national, and it has been the subject of federal legislation crafted to ensure the timely construction of disposal facilities throughout the country sufficient to accommodate the burgeoning waste. The congressional enactments were recently upheld in almost all respects by the United States Supreme Court in *New York* v. *United States* (1992) 505 U.S. __ [120 L.Ed.2d 120, 112 S.Ct. 2408]. Justice O'Connor, writing for the majority, aptly described the nature of the problem and the resulting federal legislation. Since the federal legislation forms the backdrop for the present proceeding, her synopsis bears repeating.

"We live in a world of low level radioactive waste. Radioactive material is present in luminous watch dials, smoke alarms, measurement devices, medical fluids, research materials, and the protective gear and construction materials used by workers at nuclear power plants. Low level radioactive waste is generated by the Government, by hospitals, by research institutions, and by various industries. The waste must be isolated from humans for long periods of time, often for hundreds of years. Millions of cubic feet of low level radioactive waste must be disposed of each year.

"Our Nation's first site for the land disposal of commercial low level radioactive waste opened in 1962 in Beatty, Nevada. Five more sites opened

---

[5]The term "low-level radioactive waste" is usually defined by what it does not include rather than by what it does. Under federal law, low-level radioactive waste is radioactive material that "(A) is not high-level radioactive waste, spent nuclear fuel, or byproduct material (as defined in section 2014(e)(2) of this title); and (B) the Nuclear Regulatory Commission, consistent with existing law and in accordance with paragraph (A), classifies as low-level radioactive waste." (42 U.S.C. § 2021b(9).) The definition of low-level radioactive waste in the Southwestern Low-Level Waste Disposal Compact, of which California is a member, incorporates paragraph (A) of the federal definition and adds that it is not uranium mining or mill tailings, waste for which the federal government is responsible, or "an alpha emitting transuranic nuclide with a half-life greater than five years and with a concentration greater than 100 nanocuries per gram, or Plutonium-241 with a concentration greater than 3,500 nanocuries per gram, or Curium-242 with a concentration greater than 20,000 nanocuries per gram." (Health & Saf. Code, § 25878, art. 2, subd. (I)(4).)

In general, material may be classified as low-level radioactive waste based upon its concentration of radioactive elements and the time period over which it will remain dangerously radioactive. It may be said that low-level radioactive waste includes any material, other than the definitionally excluded materials, which does not contain sufficient concentrations of fission products and is not otherwise so highly radioactive as to require permanent isolation, but which is sufficiently radioactive to require temporal isolation at a licensed disposal facility. (See 42 U.S.C. §§ 2014(dd), 10101(12); see also Cal. Code Regs., tit. 17, §§ 30269, 30285, 30287.) Thus, as petitioner California Radioactive Materials Management Forum correctly notes, "[l]ow—level radioactive waste . . . is a general term describing a wide variety of trash which becomes contaminated by radioactivity, including protective clothing, machinery, hardware, glassware, laboratory wastes, and compacted solids." (See also *Washington State Bldg. & Const. Trades* v. *Spellman* (9th Cir. 1982) 684 F.2d 627, 629.)

in the following decade: Maxey Flats, Kentucky (1963), West Valley, New York (1963), Hanford, Washington (1965), Sheffield, Illinois (1967), and Barnwell, South Carolina (1971). Between 1975 and 1978, the Illinois site closed because it was full, and water management problems caused the closure of the sites in Kentucky and New York. As a result, since 1979 only three disposal sites—those in Nevada, Washington, and South Carolina— have been in operation. Waste generated in the rest of the country must be shipped to one of these three sites for disposal.

"In 1979, both the Washington and Nevada sites were forced to shut down temporarily, leaving South Carolina to shoulder the responsibility of storing low level radioactive waste produced in every part of the country. The Governor of South Carolina, understandably perturbed, ordered a 50% reduction in the quantity of waste accepted at the Barnwell site. The Governors of Washington and Nevada announced plans to shut their sites permanently.

"Faced with the possibility that the Nation would be left with no disposal sites for low level radioactive waste, Congress responded by enacting the Low-Level Radioactive Waste Policy Act, Pub L 96-573, 94 Stat 3347. Relying largely on a report submitted by the National Governors' Association, Congress declared a federal policy of holding each State 'responsible for providing for the availability of capacity either within or outside the State for the disposal of low-level radioactive waste generated within its borders,' and found that such waste could be disposed of 'most safely and efficiently . . . on a regional basis. § 4(a)(1), 94 Stat 3348. The 1980 Act authorized States to enter into regional compacts that, once ratified by Congress, would have the authority beginning in 1986 to restrict the use of their disposal facilities to waste generated within member States. § 4(a)(2)(B), 94 Stat 3348. The 1980 Act included no penalties for States that failed to participate in this plan.

"By 1985, only three approved regional compacts had operational disposal facilities; not surprisingly, these were the compacts formed around South Carolina, Nevada, and Washington, the three sited States. The following year, the 1980 Act would have given these three compacts the ability to exclude waste from nonmembers, and the remaining 31 States would have had no assured outlet for their low level radioactive waste. With this prospect looming, Congress once again took up the issue of waste disposal. The result was the . . . Low-Level Radioactive Waste Policy Amendments Act of 1985.

". . . In broad outline, the Act embodies a compromise among the sited and unsited States. The sited States agreed to extend for seven years the

period in which they would accept low level radioactive waste from other States. In exchange, the unsited States agreed to end their reliance on the sited States by 1992." (*New York* v. *United States, supra,* 505 U.S. ___ [120 L.Ed.2d at pp. 133-134], some citations omitted.)

The Low-Level Radioactive Waste Policy Amendments Act of 1985 (1985 Act) authorizes states to enter into regional compacts "as may be necessary to provide for the establishment and operation of regional disposal facilities for low-level radioactive waste." (42 U.S.C. § 2021d(a)(2).) The 1985 Act requires the three existing disposal sites to continue to accept out-of-state waste through the end of 1992 (42 U.S.C. § 2021e(a)(2)), but also permits the three sited states to exact graduated surcharges for waste arriving from outside their regional compacts during the 1986-1992 period (42 U.S.C. § 2021e(d)(1)). The 1985 Act also permits approved regional compacts to exclude radioactive waste generated outside the region following expiration of the seven-year transition period in December 1992. (42 U.S.C. § 2021d(c); *New York* v. *United States, supra,* 505 U.S. ___ [120 L.Ed.2d at p. 135].)[6]

In response to these congressional actions, the California Legislature enacted legislation of its own to fulfill California's obligations under the Low-Level Radioactive Waste Policy Act and the 1985 Act. In 1982 the Legislature enacted legislation declaring that "California must develop plans to address the issues surrounding the long-term management, treatment, and disposal of low-level radioactive waste generated by licensed users of radioactive material within the state," since "without means for adequate, safe disposal of low-level radioactive waste, medical, industrial and other operations which contribute to the health and safety of the people of California as well as to the state economy, may be seriously impaired." (Stats. 1982, ch. 95, § 1, p. 305.) The bill amended several provisions of the Radiation Control Law (Health & Saf. Code, § 25800 et seq.), and directed the department to study, plan, and report on low-level radioactive waste storage and disposal (Stats. 1982, ch. 95, §§ 1-6, pp. 305-311).

In 1983 the Legislature enacted additional legislation which reiterated the policy statements of the 1982 legislation and further declared "that California, virtually alone among the 50 states, is not now a prospective member of

---

[6]It does not appear that the expiration of the December 1992 deadline will necessarily lead to an immediate loss of access to out-of-state disposal sites for California generators of low-level radioactive waste. In 1992, South Carolina enacted legislation that grants continued access at the Barnwell disposal site to out-of-state generators of low-level radioactive waste through June 1994, subject to certain conditions. (S.C. Code Ann. §§ 13-7-30, 48-47-30, 48-48-30, 48-48-80, 48-48-90 (Law. Co-op. 1992).)

a compact, and that California generators of low-level radioactive waste may, therefore, be excluded from use of disposal facilities in other states upon which they are now totally reliant." (Stats. 1983, ch. 1177, § 1, pp. 4470-4471.) Consequently, the Legislature again amended the Radiation Control Law to direct the Governor to negotiate and enter into an interstate agreement for low-level radioactive waste disposal, and to require the department to select a private contractor to develop a low-level radioactive waste disposal facility.[7] (Stats. 1983, ch. 1177, § 5, p. 4475, § 11, p. 4479.) The legislation also directed the department to promulgate emergency regulations concerning the licensing of the low-level radioactive waste disposal facility, including the adoption of regulations consistent with certain specified federal regulations. (Stats. 1983, ch. 1177, § 5, p. 4475.)

In 1987, California entered into a regional compact for the construction and operation of low-level radioactive waste disposal facilities with the States of Arizona, North Dakota, and South Dakota. The agreement, known as the Southwestern Low-Level Radioactive Waste Disposal Compact (Southwestern Compact), was ratified by the Legislature and codified as a new article 17 of the Radiation Control Law. (Health & Saf. Code, § 25877 et seq.) California agreed to be the "host state" for the first 30 years of the Southwestern Compact's existence. (Health & Saf. Code, § 25878, art. 2, subd. (G) & art. 4, subd. (C)(1).) At the end of the 30-year period, the other member state producing the most low-level radioactive waste would become the host state if California declined to continue in that role. (Health & Saf. Code, § 25878, art. 4, subd. (C)(1).) Pursuant to the terms of the Southwestern Compact, the host state is obligated to "[c]ause a regional disposal facility to be developed on a timely basis . . . [and] [e]nsure by law, consistent with any applicable federal laws, the protection and preservation of public health and safety in the siting, design, development, licensing, regulation, operation, closure, decommissioning, and long-term care of the regional disposal facilities within the state." (Health & Saf. Code, § 25878, art. 4, subd. (E).) Following ratification of the Southwestern Compact by the four member states, Congress ratified the Southwestern Compact in the Southwestern Low-Level Radioactive Waste Disposal Compact Consent

---

[7]The legislation further provided: "It is the intent of the Legislature, by amendment to the California Radiation Control Law, to establish a legal and regulatory framework which will assure for California generators, the safe management of low-level radioactive wastes, permit and encourage the expeditious establishment and operation by the private sector of a low-level radioactive waste disposal facility within the state and permit and encourage the establishment of those timely interim measures and facilities as may be required to meet any contingency arising from curtailed access to existing disposal facilities." (Stats. 1983, ch. 1177, § 1, p. 4471.)

Act.[8] (Pub.L. No. 100-712 (Nov. 23, 1988) §§ 1-5, 102 Stat. 4773 [see Notes, 42 U.S.C.A. § 2021d (West Supp. 1992)].)

In December 1985 the department designated US Ecology as the proposed licensee of the proposed low-level radioactive waste disposal facility in California. In 1988, following extensive studies, the department identified the Ward Valley site near Needles in San Bernardino County as the most suitable location for the low-level radioactive waste disposal facility. In December 1989 the department deemed US Ecology's application to construct and operate the facility to be complete.

Over the course of the next two years the department conducted a thorough investigation of US Ecology, the proposed disposal facility, and the proposed disposal site. At each step of the investigation, the department sought significant public participation. In June 1990 the department and the federal Bureau of Land Management issued a draft joint environmental impact report/statement (EIR/S) for the disposal facility. In July 1990 the department conducted hearings on the draft EIR at locations in Riverside, San Bernardino, Barstow and Needles. Following a period of revision and public comment, the department and the Bureau of Land Management issued a final joint EIR/S in April 1991.

The department thereafter scheduled public hearings on US Ecology's license application. Several individuals and groups contacted the department and demanded that the hearings include APA-type procedures, such as discovery and the taking of sworn testimony subject to cross-examination. The department rejected those requests, but granted party status to those who expressed a desire to comment at the hearings. The department appeared in the Sacramento County Superior Court to successfully resist a legal action to compel it to conduct formal adjudicatory hearings.

---

[8]Upon approval by Congress an interstate compact becomes a federal law and is subject to federal rather than state construction. (*Cuyler* v. *Adams* (1981) 449 U.S. 433, 438, 440 [66 L.Ed.2d 641, 647, 649, 101 S.Ct. 703]; *Dyer* v. *Sims* (1951) 341 U.S. 22, 27-28 [95 L.Ed. 713, 721-722, 71 S.Ct. 557]; cf. *Tahoe Regional Planning Agency* v. *King* (1991) 233 Cal.App.3d 1365, 1382-1385 [285 Cal.Rptr. 335].) However, the issues in this case arise under state rather than federal law by virtue of article 5 of the compact, which provides: "A regional disposal facility shall be approved by the host state in accordance with its laws. This compact does not confer any authority on the [Southwestern Low-Level Radioactive Waste] commission regarding the siting, design, development, licensure, or other regulation, or the operation, closure, decommissioning, or long-term care of, any regional disposal facility within a party state." (Health & Saf. Code, § 25878, art. 5.) Moreover, except with respect to certain provisions designed to expedite state consideration of license applications, federal law leaves it to the state to establish procedures for processing applications and requires the state to consider an application "in accordance with the laws applicable to such application . . . ." (42 U.S.C. § 2021i.)

The licensing hearings were conducted on July 22, 1991, at three sites: Needles, Los Angeles and Sacramento. Administrative law judges (ALJ's) presided over the hearings. At the outset of each hearing, the ALJ stated that the hearing was being held in accordance with Health and Safety Code section 25845; there would be no testimony or cross-examination, but interested individuals would be given five minutes apiece to present their comments, recommendations or other information concerning the terms and conditions of the draft license, the final EIR, the department's compliance with federal, state, and local laws, and any other information relevant to the proposed license; the proceedings would be recorded and transcribed by a certified shorthand reporter, and the transcript would be made part of the administrative record; written submissions could be submitted either at the hearing or to the department by August 5, 1991; and any written submission would be included in the administrative record and considered by the department before deciding whether to issue the license. The hearings, which lasted several hours apiece, were spirited, and at times acrimonious, as there were speakers both for and against the project at all three locations.

After reviewing the hearing transcripts, written submissions, and all of the materials presented with the license application, the department determined, in December 1991, that no further information would be needed from US Ecology to rule on the license application.

Before the department could render its decision, however, the Senate Rules Committee intervened to impose a requirement for further administrative proceedings in a formal adjudicatory mode. From February through May 1992, the Senate Rules Committee convened committee hearings to consider the Governor's nominations of respondent Gould to be Secretary of the Health and Welfare Agency and respondent Coye to be Director of Health Services. (See Gov. Code, § 1774.) The appointments were significant because the department is responsible for licensing the proposed low-level radioactive waste disposal facility and the department is subject to the supervision of the Health and Welfare Agency. (Health & Saf. Code, § 25810; Gov. Code § 12803.) During the committee hearings, Gould and Coye, who had been serving as the acting secretary and the acting director, were asked whether an APA adjudicatory proceeding would be required on the US Ecology license application prior to the department's licensing decision. When the nominees replied in the negative, and opined that the earlier proceedings were sufficient, they were informed by committee members that their confirmations by the full Senate would be difficult. Eventually Gould and Coye agreed to require further proceedings which would include many attributes of an APA administrative hearing. Their nominations were then forwarded to, and approved by, the full Senate.

The hearings which Gould and Coye agreed to require and which the department intends to conduct would have the following components: notice of the hearing would be published and mailed to those that had received notice of the previous hearings; an ALJ and a scientific adviser to the ALJ would preside over the proceeding; those desiring to participate as parties at the proceeding would be required to respond within 30 days of notice and to specify the issues they intended to raise; 30 days after the receipt of the responses the ALJ would make a written finding as to each request to participate as a party, specify the issues to be considered at the hearing, and set a hearing date; within 15 days from the identification of parties and issues the parties would submit any discovery request; within 30 days of a discovery request the discovery materials would be provided; if discovery materials were not provided the affected party would be permitted to petition the ALJ to compel discovery; the actual hearing would commence 60 days after any discovery request or 30 days after compliance with an order to compel discovery, whichever was later; at the hearing US Ecology would proceed first, those granted party status would proceed second, and the department would proceed last; all witnesses would be sworn and subject to cross-examination in a manner consistent with an APA adjudicatory proceeding; 30 days from the close of the hearing the ALJ would submit a proposed decision including findings of fact and a legal analysis of the issues that the department is required to consider for the licensing decision; the findings and analysis would be served on all of the parties, with copies provided to the Governor and Legislature; thereafter the director would act on the license application based upon the entire record, including the record of earlier hearings, California Environmental Quality Act hearings, and the proposed proceeding; and in making the licensing decision the director would follow as closely as practicable the procedures for adoption of a decision by an ALJ in an adjudicatory proceeding under the APA.

Although the proposed proceeding just outlined was not labelled an APA proceeding as such, no elaborate comparison is needed to discern that the two are in substance and legal effect the same. With minor variations, the procedures detailed in the agreement mirror those of an APA adjudicatory proceeding. (See Gov. Code, §§ 11502-11517.)[9]

On May 26, 1992, US Ecology wrote to Director Coye and requested that she reject the proposed agreement with the Senate Rules Committee and

[9]In an administrative adjudicatory proceeding under the APA, an ALJ presides (Gov. Code. § 11502); the proceeding is initiated by the filing of a statement of issues (Gov. Code, § 11504); the statement of issues must be served on the respondent (Gov. Code, § 11505, subd. (a)); the respondent may request a hearing and raise new issues within 15 days of service (Gov. Code, § 11506); the parties are entitled to discovery (Gov. Code § 11507.6); a party claiming that a discovery request has been denied may petition a superior court for an order compelling discovery (Gov. Code, § 11507.7); the administrative agency determines the

make a licensing decision on the basis of the existing record. By letter dated June 2, 1992, Director Coye denied these requests and informed US Ecology that both she and Secretary Gould intended to honor their agreement with the Senate Rules Committee "to provide a hearing consistent with the California Administrative Procedure Act." The instant petitions were filed thereafter.

On September 1, 1992, the Governor signed into law a new budget that included a $2.3 million outlay for the proposed proceeding. (Stats. 1992, ch. 587, p. 225.) Although time estimates are necessarily speculative, the proposed proceeding is expected to delay construction of the disposal facility from 18 months to several years.

### DISCUSSION

#### I. Is the Proposed Hearing Legally Required?

##### A. Statutory Provisions

■ Federal law requires expeditious consideration of US Ecology's license application, and the Southwestern Compact requires California, as the host state, to cause a regional disposal facility to be developed on a timely basis. (42 U.S.C. § 2021i; Health & Saf. Code, § 25878, art. 4, subd. (E).) However, as we have previously noted (ante, fn. 8) this state retains authority over the facility, and the facility must be approved and licensed in accordance with our laws. (Health & Saf. Code, § 25878, art. 5; 42 U.S.C. § 2021i.) Under our Radiation Control Law, the department is the agency which is responsible for the issuance of licenses. (Health & Saf. Code, § 25810.) Administrative procedures under the Radiation Control Law are governed by Health and Safety Code sections 25845 (hearings), 25846 (emergency regulations and orders), and 25847 (judicial review).

Health and Safety Code section 25845 provides: "(a) In any proceeding under this chapter for granting or amending any license, or for determining compliance with, or granting exceptions from, rules and regulations promulgated in accordance with this chapter, the department shall afford an opportunity for a hearing on the record upon the request of any person whose interest may be affected by the proceeding, and shall admit that person as a party to such proceeding.

---

time and place of the hearing (Gov. Code, § 11508); oral evidence at the hearing must be under oath and subject to cross-examination (Gov. Code, § 11513); 30 days after the case is submitted the ALJ must prepare and serve a proposed decision that the administrative agency may adopt as the decision in the case (Gov. Code, § 11517); and the administrative agency may adopt the proposed decision in its entirety or decide the case upon the record with or without the taking of additional evidence (Gov. Code, § 11517).

"(b) Proceedings for the suspension or revocation of licenses under this chapter shall be conducted in accordance with the provisions of Chapter 5 (commencing with section 11500) of Part 1 of Division 3 of Title 2 of the Government Code, and the department shall have all the powers granted therein.

"(c) The adoption, repeal, or amendment of rules and regulations pursuant to this chapter shall be accomplished in conformity with the provisions of Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code."

In this part of the Radiation Control Law, the Legislature expressly provided for compliance with APA procedures with respect to rulemaking and in connection with adverse action against a licensee but not in connection with granting or amending a license. The APA provides that its procedures apply only to the functions of a state agency to which they are made applicable by statute. (Gov. Code, § 11501, subd. (a); *Bertch* v. *Social Welfare Dept.* (1955) 45 Cal.2d 524, 527 [289 P.2d 485], overruled on another ground in *Frink* v. *Prod* (1982) 31 Cal.3d 166, 180 [181 Cal.Rptr. 893, 643 P.2d 476]; *Serenko* v. *Bright* (1968) 263 Cal.App.2d 682, 690 [70 Cal.Rptr. 1]; *Taliaferro* v. *Insurance Commission* (1956) 142 Cal.App.2d 487, 489 [298 P.2d 914].)[10] From the very terms of the statute, it follows ipso facto that formal APA adjudicatory procedures apply to the suspension or revocation of a license but not to the initial decision to grant or to amend a license.

We cannot imply a requirement of an APA-type adjudicatory hearing for granting or issuing a license. ▪ Where the Legislature has carefully employed a term or phrase in one place and has excluded it in another, it should not be implied where excluded. (*Pasadena Police Officers Assn.* v. *City of Pasadena* (1990) 51 Cal.3d 564, 576 [273 Cal.Rptr. 584, 797 P.2d 608]; *Ford Motor Co.* v. *County of Tulare* (1983) 145 Cal.App.3d 688, 691 [193 Cal.Rptr. 511].) Health and Safety Code section 25845, subdivision (b), specifically requires an APA adjudicatory hearing for the suspension or

---

[10]Government Code section 11501, subdivision (a), provides that the adjudicatory procedures of the APA apply "to any agency as determined by the statutes relating to that agency." The decisions cited were based on the Government Code, former section 11501, subdivision (b), which provided: "The procedure of any agency shall be conducted pursuant to the provisions of this chapter only as to those functions to which this chapter is made applicable by the statutes relating to the particular agency." (See *Bertch* v. *Social Welfare Dept., supra*, 45 Cal.2d at p. 527, italics deleted.) The change in the language of the statute was made in 1977. (Stats. 1977, ch. 122, § 2, p. 558.) The change was not intended to be substantive. (See Legis. Counsel's Dig., Sen. Bill No. 441, 3 Stats. 1977 (Reg. Sess.) Summary Dig., p. 32.)

revocation of licenses, and subdivision (c) specifically requires adherence to the APA for the adoption, repeal or amendment of rules and regulations. In view of these provisions the absence of an APA requirement in section 25845, subdivision (a), for granting or amending a license, is conspicuous and is strong evidence that the Legislature did not intend to require an APA-type adjudicatory hearing for granting or amending a license under the Radiation Control Law.

■■■■ It is suggested that the specification of a "hearing on the record" implies the formality of an APA adjudicatory hearing. We disagree. In this state the phrase "hearing on the record" is not a term of art which implies a requirement of a formal APA-type adjudicatory hearing. We have found no statutory or decisional authority so construing the phrase. Rather, our Legislature has created and consistently employed a standard mechanism for triggering the requirement of an APA-type adjudicatory hearing, namely, where such a hearing is intended the statute providing for the hearing expressly states that it shall be conducted under the APA. (See, e.g., Health & Saf. Code, § 25845, subd. (b).) The Legislature has used these same words in a multitude of statutory provisions (Cal. Administrative Hearing Practice (Cont.Ed.Bar 1984) Appendix: State-Level Adjudicatory Activities, pp. 287-370 [compilation of statutes designating whether APA applies to particular administrative agency decision]; see also Cal. Administrative Hearing Practice Update (Sept. 1992) pp. 47-120), and where these words appear they indisputably designate application of the APA's adjudicatory procedures, for clear statutory language is enforced according to its terms (*Leroy T.* v. *Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 434, 438 [115 Cal.Rptr. 761, 525 P.2d 665]; *Caminetti* v. *Pacific Mut. L. Ins. Co.* (1943) 22 Cal.2d 344, 353-354 [139 P.2d 908]). As noted, the absence of these words in Health and Safety Code section 25845, subdivision (a), demonstrates that the Legislature did not intend that the APA apply to the licensing decision at issue. (*Bertch* v. *Social Welfare Dept.*, *supra*, 45 Cal.2d at p. 527, overruled on another ground in *Frink* v. *Prod.*, *supra*, 31 Cal.3d at p. 180; *Serenko* v. *Bright*, *supra*, 263 Cal.App.2d at p. 690.)

Decisional authorities construing the federal Administrative Procedure Act (federal APA) are inapposite. (See *United States* v. *Florida East Coast R. Co.* (1973) 410 U.S. 224, 236-238 [35 L.Ed.2d 223, 234-235, 93 S.Ct. 801]; *United States* v. *Allegheny-Ludlum Steel* (1972) 406 U.S. 742, 757 [32 L.Ed.2d 453, 465, 92 S.Ct. 1941]; *West Chicago, Ill.* v. *U.S. Nuclear Regulatory Com'n.* (7th Cir. 1983) 701 F.2d 632, 641; *Gallagher & Ascher Co.* v. *Simon* (7th Cir. 1982) 687 F.2d 1067, 1074, 66 A.L.R.Fed. 264; *South Terminal Corp.* v. *Environmental Protection Agcy.* (1st Cir. 1974) 504 F.2d 646, 660 [30 A.L.R.Fed. 109]; see 2 Davis, Administrative Law Treatise (2d

ed. 1979) § 10:7, p. 329.) The procedures of the federal APA apply "in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing," except where statutorily excluded. (5 U.S.C. §§ 554(a), 554(c), 556, 557; see also § 553(c).) Thus, while "on the record" is not a term of art (*United States* v. *Florida East Coast R. Co.*, *supra*, 410 U.S. at p. 238 [35 L.Ed.2d at p. 235]), Congress has statutorily adopted an on-the-record requirement as a shorthand means for triggering federal APA adjudicatory procedures (see *West Chicago, Ill.* v. *U.S. Nuclear Regulatory Com'n.*, *supra*, 701 F.2d at p. 641). In contrast, our Legislature has never adopted a similar shorthand means for incorporating the procedures of the APA, either by statutory enactment or by informal practice. Rather, our state APA applies only where it is specifically made applicable by statute. Accordingly, authorities considering the federal APA are not persuasive. In fact, we find it inconceivable that the Legislature would have chosen such an abstruse and ambiguous means of requiring a formal adjudicatory hearing in view of its otherwise consistent adherence to the standard means of incorporating the APA which it followed in other subdivisions of the same statute we are considering.

In any event, the analogy to federal authorities is superficial. It is a fundamental tenet of administrative law that the character of hearing which an agency must hold is dependent upon the nature of the contemplated agency action and the interest of the person to be heard. (*Los Angeles County Civil Service Com.* v. *Superior Court* (1978) 23 Cal.3d 55, 62 [151 Cal.Rptr. 547, 588 P.2d 249].) The federal APA recognizes the distinction between adverse action proposed to be taken against a licensee and the decision whether to grant a license: "In rule making or determining claims for money or benefits or applications for initial licenses an agency may, when a party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form." (5 U.S.C. § 556(d).) Thus, under the federal APA, with respect to initial licensing decisions, federal agencies have discretion to determine whether formal adversary hearings are necessary. (*Cellular Mobile Systems of Pennsylvania* v. *F.C.C.* (D.C.Cir. 1985) 782 F.2d 182, 198 [251 U.S.App.D.C. 100]; *United States* v. *F. C. C.* (D.C.Cir. 1980) 652 F.2d 72, 88-96 [209 App.D.C. 79]; *Yellow Forwarding Company* v. *I. C. C.* (D.Kan. 1973) 369 F.Supp. 1040, 1048.)

Moreover, proposed actions of an administrative agency usually involve the agency and a person with a status such as applicant or licensee. With respect to other persons the federal APA provides: "So far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or

determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function. . . ." (5 U.S.C. § 555(b).) This provision gives federal agencies broad discretion in determining whether interested parties will be permitted to participate and the nature of participation which will be permitted. (*Nichols* v. *Asbestos Workers Local 24 Pension Plan* (D.C. Cir. 1987) 835 F.2d 881, 897-899.) Many federal agencies have provided in their rules for third party participation; however, "[w]hile the practice varies with each agency, the majority provide for presentation of oral arguments or submission of briefs, or, on a more informal basis, an oral statement or submission of an informal letter. . . ." (See Comment (1959) 47 Cal.L.Rev. 747, 748-749.) Third party participation does not always, or even usually, include the right to trial-type or other formal procedures. (*Nichols* v. *Asbestos Workers Local 24 Pension Plan, supra,* 835 F.2d at p. 899, fn. 124.)

█ From these authorities it can be seen that under federal administrative law a reference to a hearing "on the record" does not mean that interested third parties will necessarily be entitled to insist upon a formal trial-type hearing to resolve objections to the granting of a license. (See *United States* v. *Florida East Coast R. Co., supra,* 410 U.S. at p. 241 [35 L.Ed.2d at pp. 236-237]; *Long Island Railroad Company* v. *United States* (E.D.N.Y. 1970) 318 F.Supp. 490, 498.) Accordingly, even if we accept the extremely dubious claim that our Legislature had federal APA procedures in mind in providing for a hearing on the record at the behest of any interested person, it would not follow that such an interested person is entitled to full participation in a formal adversarial hearing.[11]

There are obvious reasons for the language utilized by the Legislature in Health and Safety Code section 25845, subdivision (a). As we have noted, generally a decision to issue a license or other certificate of authority is a matter between the licensing agency and the applicant. In this state it has been concluded that in the absence of statutory authority third parties have no standing to insist upon a hearing to resolve objections to the issuance of a license. (See *Sale* v. *Railroad Commission* (1940) 15 Cal.2d 612, 614-615 [104 P.2d 38]; 32 Ops.Cal.Atty.Gen. 297 (1959).) With respect to the issuance of licenses under the Radiation Control Law, the Legislature clearly intended to give any person whose interest may be affected the right to request a hearing. In order to do so it was necessary that the statute expressly

---

[11]To the extent that US Ecology, as the prospective licensee, may have been entitled to ask for trial-type adversary proceedings, it has obviously waived that right. The only parties who seek trial-type adversary proceedings in connection with Ward Valley are third parties who claim to be interested in the matter. Under general administrative law principles such parties are rarely accorded full participatory rights in formal adjudicatory proceedings.

so provide. (*Ibid.*) However, Health and Safety Code section 25845, subdivision (a), does not expressly or by necessary implication give interested third parties the right to insist upon full participation in a formal adjudicatory hearing.[12]

The Legislature also intended that any decision to grant or amend a license would be subject to judicial review. (Health & Saf. Code, § 25847.) ■ The Senate Rules Committee asserts that the provision for judicial review requires that the proceeding be conducted with APA formality. We disagree. Effective judicial review requires that an administrative proceeding be "on the record," but that simply means that the proceedings be recorded and that the decision be based solely upon information in the record. (*California Assn. of Nursing Homes etc., Inc.* v. *Williams* (1970) 4 Cal.App.3d 800, 810-812 [84 Cal.Rptr. 590].) Judicial review does not require that an administrative hearing be conducted with APA formality. (See *White* v. *County of San Diego* (1980) 26 Cal.3d 897, 902-903 [163 Cal.Rptr. 640, 608 P.2d 728]; *Dawson* v. *Town of Los Altos Hills* (1976) 16 Cal.3d 676, 683 [129 Cal.Rptr. 97, 547 P.2d 1377].)

■ We conclude that the readily discernable purposes of the Legislature in Health and Safety Code section 25845, subdivision (a), those being to require a hearing at the behest of interested third parties and to provide a record for judicial review, do not require a formal APA-type hearing. Rather, the character of a public hearing "may be only 'the opportunity to present statements, arguments, or contentions in writing, with or without opportunity to present the same orally.' " (*Los Angeles County Civil Service Com.* v.

---

[12]In fact, to grant all interested persons the right to full participation as a party in a formal adjudicatory hearing would likely lead to proceedings which would be unduly time-consuming and, in all probability, unmanageable. As the federal court of appeals noted in a similar context: "To allow others to force the Commission to conduct further evidentiary inquiry would be to arm interested parties with a potent instrument for delay. The sad truth about agency decisionmaking and evidentiary inquiries is that they take time; and time often works to the advantage of one party over another. Although evidentiary hearings and other procedural devices are useful—and sometimes indispensable—they may also be exploited for unworthy purposes. For that reason this court has held: [¶] [T]he decision of whether or not hearings are necessary or desirable is a matter in which the Commission's discretion and expertise is paramount. . . ." (*United States* v. *F. C. C., supra,* 652 F.2d at p. 91, citing *Columbus Broadcasting Coalition* v. *F. C. C.* (D.C.Cir. 1974) 505 F.2d 320, 324 [164 U.S.App.D.C. 213].) The Legislature doubtlessly had this factor in mind when it declined to require the department to accord interested persons an APA-type adjudicatory hearing in connection with granting a license under the Radiation Control Law. The procedure to make a low-level radioactive waste disposal site operational would be inherently time-consuming but the Legislature, along with Congress and the Southwestern Compact, contemplated that the department would act as expeditiously as principles of sound public decisionmaking would permit. This purpose would be thwarted by granting all interested persons full participatory party status in formal adjudicatory proceedings.

*Superior Court, supra,* 23 Cal.3d at p. 62.) The Senate Rules Committee asserts that reference to the department's role in this matter, which it describes as a classic quasi-judicial function, requires formal adjudicatory procedures. The department's role in these proceedings is hardly a classic quasi-judicial function. In a classic quasi-judicial proceeding, an applicant seeks a license or permit under existing statutes or regulations and an administrative agency is charged with determining whether the applicant has met the legal standard for issuance of the license or permit. (See, e.g., *Weiss* v. *State Board of Equalization* (1953) 40 Cal.2d 772, 775 [256 P.2d 1].) In contrast, in these proceedings the department is attempting to fulfill this state's obligations under federal law and the Southwestern Compact, and under the policies declared by our Legislature. There is but one project and can be but one designee who may apply for a license. (Health & Saf. Code, § 25812.5, subd. (b).) The project is in the nature of a cooperative endeavor between the state and the prospective licensee. The land will be owned by the state and under our statutes cannot be privately owned. (Health & Saf. Code, § 25812, subd. (a)(1).) In the implementation of this project some of the department's functions are in fact quasi-judicial, but in other respects, such as site selection and regulation, the department is exercising executive and quasi-legislative functions. (See *Simpson* v. *Hite* (1950) 36 Cal.2d 125, 130 [222 P.2d 225].) It was obviously due to the unusual nature of this proceeding that the Legislature took the unusual step of authorizing interested third parties to request a hearing. That is also the obvious reason the Legislature did not require that such a hearing be conducted with APA formality.

The Senate Rules Committee points to the legislative history of the Radiation Control Law to discern authority for its claim that an APA-type proceeding is required by Health and Safety Code section 25845, subdivision (a). The Radiation Control Law was enacted in response to federal legislation authorizing the Atomic Energy Commission (now the Nuclear Regulatory Commission) to enter into agreements for the transfer of authority for the regulation and control of certain types of nuclear materials from the commission to individual states. (42 U.S.C. § 2021(b).) To qualify for the transfer, the governor of a state that desired to assume regulatory authority was required to certify "that the State has a program for the control of radiation hazards adequate to protect the public health and safety with respect to the materials within the State covered by the proposed agreement . . . ." (42 U.S.C. § 2021(d)(1).) In order to facilitate the transfer of authority between governments, model legislation was drafted for use by the states in developing an adequate program for the control of radiation hazards. Section 12(a) of the model legislation provided: "(a) in any proceeding

under this act [or cite appropriate act]: [¶] (1) for the issuance or modification of rules and regulations relating to control of sources of ionizing radiations; or [¶] (2) for granting, suspending, revoking, or amending any license; or [¶] (3) for determining compliance with [or granting exceptions from] rules and regulations of the [agencies or cite appropriate agency], [the agencies or agency] shall afford an opportunity for a hearing on the record upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding." (9 Assem. Interim. Comm. on Public Health, Subcom. on Radiation Protection (1959-1961) No. 23, Radiation Protection in Cal. (Jan. 1961) p. 69, fn. omitted & brackets in original.) Since, as we have noted, the federal APA adopts an "on the record" requirement as a means of incorporating federal APA procedures, and since the model legislation was designed to facilitate transfer of authority from the federal government to the states, it is asserted that the "on the record" provision in the model legislation was intended to require formal adjudicatory procedures. Because Health and Safety Code section 25845, subdivision (a), parallels the model legislation, it is asserted that it too was intended to require formal adjudicatory procedures.

The argument is unconvincing. As we have explained, under federal law an "on the record" requirement is not a term of art but is a statutorily adopted shorthand means for incorporating the federal APA. (*United States* v. *Florida East Coast R. Co.*, *supra*, 410 U.S. at p. 238 [35 L.Ed.2d at p. 235].) And as we have further noted, our Legislature has never adopted a similar shorthand means of incorporating our APA either by statute or by informal practice. In enacting the Radiation Control Law our Legislature did not simply adopt the model legislation, which lumps together all proceedings with respect to rulemaking and licensing actions in imposing a hearing requirement. Rather, our Legislature specifically segregated decisions to grant or amend a license from decisions to revoke or suspend a license, and employed our statutorily adopted means for requiring formal adjudicatory hearings only with respect to the latter decisions. Such affirmative remodelling of the model legislation simply does not permit the conclusion that the Legislature intended to impose the same hearing requirements with respect to each type of action.

The Senate Rules Committee contends that the "compatability" requirements of federal and state law require formal adjudicatory hearings for the licensure of the Ward Valley facility. It claims that the Nuclear Regulatory Commission's regulatory program would provide a formal adjudicatory hearing upon request in connection with the licensing of a low-level radioactive waste disposal facility (see 10 C.F.R. §§ 2.105(a)(2), 2.714(a)(1)), and

that to be compatible a state regulatory program must also authorize an APA-type proceeding upon request. Petitioners, on the other hand, refer us to two letters from agents of the Nuclear Regulatory Commission expressing the commission's view that the compatibility requirement does not extend to administrative procedures.[13] The commission's view is entitled to judicial deference. (*Ford Motor Credit Co.* v. *Milhollin* (1980) 444 U.S. 555, 566 [63 L.Ed.2d 22, 31, 100 S.Ct. 790]; *Power Reactor Co.* v. *Electricians* (1961) 367 U.S. 396, 408 [6 L.Ed.2d 924, 932, 81 S.Ct. 1529].) In any event,

---

[13]The first is a letter dated April 6, 1992, from John B. Martin, the Regional Administrator of the Nuclear Regulatory Commission, to Senator William Craven, a member of the Senate Rules Committee. Regional Administrator Martin's letter was written in response to two questions Senator Craven had posed with respect to the compatibility requirement. The first question was whether federal regulations required that a formal adjudicatory hearing be held prior to issuance of a license for a low-level radioactive waste disposal facility. Martin responded that federal regulations did not require a hearing, but that one would be held upon timely request by an individual who demonstrated standing to intervene. The second question was whether California law would be incompatible with federal law if the former did not include a requirement that "a formal 'adjudicatory hearing' " be conducted before issuance of a license for a low-level radioactive waste disposal facility. The regional administrator responded: "The Commission has never considered hearing procedures, other than on uranium mill tailings, to be matters of compatibility."

The letter continued: "Under section 274(d) of the Atomic Energy Act, 42 U.S.C. 2021(d), the Commission is *required* to confer Agreement State status to states whose programs are 'in accordance with the requirements of [section 274(o)] and in all other respects compatible with the Commission's program for regulation of such materials. . . .' Under section 274(o), the Commission must require states to conduct formal adjudicatory hearings on applications for disposal of uranium mill tailings. The Commission has interpreted its charge under Section 274(d) to be to assure that the substantive safety programs of the States are compatible with the NRC's safety program." (Italics and brackets in original.)

The second letter, dated April 7, 1992, was written by Lawrence J. Chandler, the Assistant General Counsel for Hearings and Enforcement of the Nuclear Regulatory Commission's Office of General Counsel, to Ron Joseph, Chief Deputy Director of Operations for the department. Chandler's letter was written in response to Joseph's inquiry concerning the hearing procedures that might be used by the department in the state licensing process. Chandler noted that Regional Administrator Martin had previously responded to a similar inquiry from Senator Craven, and he included a copy of Martin's letter. Chandler then reiterated the commission's position that the compatibility requirement would not apply to state licensing of a low-level radioactive waste disposal facility.

Chandler wrote in part: "Generally speaking, compatibility is not required for licensing procedures such as hearings. Compatibility is generally limited to substantive health and safety rules, such as radiation dose and exposure limits. With respect to 10 C.F.R. Part 61, only § 61.2, Definitions; Subpart C, Performance Objectives; Subpart D, Technical Requirements; Portions of Subpart B necessary to implement Subparts C and D; closure funding requirements, and the manifest required by 10 C.F.R. § 20.311, were considered to be items of compatibility for Agreement States. None of these section [*sic*] refer to hearings. [¶] The only variation on this position is to be found in Section 274o. of the Atomic Energy Act, where the Congress required Agreement States to provide special hearing procedures for the licensing and regulation of uranium mill tailings, a requirement not pertinent in the context of siting of a low-level waste disposal facility."

we find ample support for that view in the applicable federal statutory provisions.

In an earlier version, title 42, United States Code, section 2021(c), permitted the Atomic Energy Commission (now the Nuclear Regulatory Commission) to enter into agreements to transfer regulatory authority to the states with respect to certain kinds of radioactive materials. In support of such an agreement, the commission was required to find "that the State program is compatible with the Commission's program for the regulation of such materials, and that the State program is adequate to protect the public health and safety with respect to the materials covered by the proposed agreement." (42 U.S.C., former § 2021(d)(2).) In 1978 Congress acted to impose a public hearing requirement with respect to one specific type of nuclear material. It added subdivision (o) to section 2021 to provide, inter alia: "In the licensing and regulation of byproduct material, as defined in section 2014(e)(2) of this title, or of any activity which results in the production of byproduct material as so defined under an agreement entered into pursuant to subsection (b) of this section, a State shall require— . . . [¶] (3) procedures which—[¶] (A) in the case of licenses, provide procedures under State law which include—[¶] (i) an opportunity, after public notice, for written comments and a public hearing, with a transcript, [¶] (ii) an opportunity for cross examination, and [¶] (iii) a written determination which is based upon findings included in such determination and upon the evidence presented during the public comment period and which is subject to judicial review; . . ."[14] (Pub.L. No. 95-604 (Nov. 8, 1978) § 204(e)(1).) Congress amended section 2021(b) to provide that in support of an agreement transferring regulatory authority to a state the commission must find that the state program "is in accordance with the requirements of subsection (o) of this section and in all other respects compatible" with the commission's program. (Pub.L. No. 95-604 (Nov. 8, 1978) § 204(b), 92 Stat. 3036.) The immediate imposition of the requirements of subdivision (o) upon the states proved burdensome and in 1979 Congress provided for a phase-in period by providing that subdivision (o) would apply only to the maximum extent practicable during the three-year period following its enactment. (Pub.L. No. 96-106 (Nov. 8, 1979) § 22(d), 93 Stat. 800.)

This history is significant. If federal hearing procedures were included within the general compatibility requirements imposed upon the states then it

[14]This provision does not require all of the procedures which would be applicable in an APA hearing under state or federal law but it does impose upon the states certain minimal public hearing requirements with respect to one type of nuclear material under a state's regulatory control. At least to the extent that it requires an opportunity for cross-examination it imposes more formal hearing requirements than the department has employed in the Ward Valley application process. As we shall explain, by express statutory definition this provision is not applicable to low-level radioactive waste disposal licenses.

would have been wholly unnecessary to add specific hearing requirements with respect to byproduct materials. It would have been unnecessary to phase in those requirements to minimize the burden imposed upon the states. And, to require the states to comply with the hearing requirements of title 42, United States Code section 2021(o) with respect to byproduct materials and otherwise be compatible with the commission's program would be redundant. Moreover, the fact that Congress chose to impose specific hearing requirements upon the states with respect to only one type of nuclear material is convincing evidence that it did not intend to impose particular hearing requirements with respect to other types of nuclear material. (See *Pasadena Police Officers Assn.* v. *City of Pasadena, supra,* 51 Cal.3d at p. 576; *Ford Motor Co.* v. *County of Tulare, supra,* 145 Cal.App.3d at p. 691.)

By express definition, low-level radioactive waste is not "byproduct material" as defined in title 42, United States Code section 2014(e)(2) to which the hearing requirements of section 2021(o) apply. (42 U.S.C. § 2021b(9).) Under federal law, a state's authority over the regulation of low-level radioactive waste is treated differently from state authority over other types of nuclear materials. Congress did not merely authorize the commission to transfer authority over low-level radioactive waste disposal to the states; rather, by separate statutory provision it imposed responsibility for the disposal of low-level radioactive waste upon the states.[15] (42 U.S.C. § 2021c.) It authorized the states to enter into regional compacts to fulfill

---

[15] In addition to declaring a policy of state responsibility for disposal of low-level radioactive waste, Congress created a statutory scheme to encourage, and in fact compel, the states to provide for the disposal of low-level radioactive waste generated within their borders. This scheme included financial incentives and eventual denial of access to out-of-state disposal facilities except pursuant to a regional compact of which the state is a member. (*New York* v. *United States, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 135].) It also provided that after January 1, 1996, any state that failed to provide disposal facilities would be required to take title to, and possession of, low-level radioactive waste generated within the state and would be liable to the generator or owner for all damages incurred as the result of the failure to provide disposal facilities. (*Id.* at p. __ [120 L.Ed.2d at pp. 135-136].) The Supreme Court upheld the financial and access incentives in the statutory scheme but found the "take title" provisions to be unconstitutional. ( *Id.* at p. __ [120 L.Ed.2 at p. 151].) As a result, a state can decline to provide for the disposal of low-level radioactive waste generated within its borders without suffering direct consequences. However, the result of such refusal would be the loss of federal financial incentives for the state and the loss of access to disposal facilities for generators of waste within the state, which would virtually shut down any activity that generates such waste. It is the public policy of this state to encourage the constructive development of industries which produce or utilize atomic energy and radiation and to permit the maximum utilization of sources of radiation consistent with the health and safety of the public. (Health & Saf. Code, §§ 25710, subd. (a), 25802, subd. (d).) To the extent the congressional "cooperative federalism" scheme gave the states a choice in the matter, our Legislature has affirmatively chosen to provide access to disposal facilities for generators of low-level radioactive waste by participating in the Southwestern Compact and by serving as

that responsibility. (42 U.S.C. § 2021d.) With respect to such compacts, Congress expressly imposed certain requirements upon the states and otherwise provided that nothing in the federal law "expands, diminishes, or otherwise affects State law." (42 U.S.C. § 2021d(b)(5).) Although Congress acted to require states to consider license applications in an expeditious manner, it did not impose particular hearing requirements upon the states and instead provided that states "shall consider an application for a disposal facility license in accordance with the laws applicable to such application, . . . ." (42 U.S.C. § 2021i.)[16] It left it to the states to establish procedures for considering license applications. (42 U.S.C. § 2021i(1).) Accordingly, we find nothing in federal law specific to low-level radioactive waste disposal which would impose particular hearing requirements upon the states.

Our state compatibility provisions do not furnish a basis for implying a formal hearing requirement for licensing decisions. In our Radiation Control Law, the Legislature established that it is the policy of this state that our regulatory program be compatible with the standards and regulatory programs of the federal government. (Health & Saf. Code, § 25801, subd. (a).) In the agreement with the Atomic Energy Commission by which regulatory authority was transferred to this state, California agreed to use its best efforts to maintain such compatibility. (Health & Saf. Code, § 25876, art. V.) Such a policy was a congressionally required condition of the agreement transferring regulatory authority. (42 U.S.C. § 2021(d).) We do not perceive in our compatibility provisions any greater requirements than those of the federal compatibility provisions.

In summary, in the Radiation Control Law the Legislature specifically separated proceedings for granting or amending a license from proceedings to suspend or revoke a license, and required formal adjudicatory proceedings only with respect to the latter. (Health & Saf. Code, § 25845.) We have found no basis for implying a formal adjudicatory hearing requirement with respect to license applications and we have found no other statutory basis for the claim that a formal adjudicatory hearing is required. Accordingly, we conclude that the proposed hearings are not statutorily required.

---

the initial host state under the compact. Accordingly, whether this state will assume responsibility for causing a low-level radioactive waste disposal facility to be developed is not an open question.

[16]In title 42, United States Code section 2021i, Congress left it to the states to establish procedures and to develop the technical capability for considering license applications, but provided that to the extent practicable all licensing activities except public hearings should be completed within 15 months of receipt of the application and all required technical and environmental reviews and public hearings should be consolidated.

B. *The Agreement With the Senate Rules Committee*

 This brings us to the real issue in this case, namely, whether respondents are required to proceed with a formal adjudicatory hearing based upon a purported agreement extracted from nominees during the confirmation process. That this agreement is the sole reason for the department's intention to proceed with a formal adjudicatory hearing is beyond question. Without attempting to be exhaustive, this is established by the following facts:

(1) When the EIR process was completed and the department scheduled public hearings on US Ecology's license application, it arranged the hearings in order to provide for widespread participation by interested parties but determined not to conduct APA-type hearings. The department rejected demands from several individuals and groups for APA-type hearings. The department appeared in the Sacramento County Superior Court to resist efforts by third parties to judicially compel it to hold APA-type hearings. Following the hearings the department determined that it had sufficient information to make a decision upon the license application and that no further hearings were needed.

(2) When respondents Coye and Gould appeared before the Senate Rules Committee for their confirmation hearings they initially expressed the view that further hearings were neither factually necessary nor legally required. The Senate Rules Committee used the confirmation process to convince the appointees to agree to further hearings in an APA mode. Thereafter in correspondence and otherwise the Senate Rules Committee and the appointees consistently referred to their agreement as the reason for the further hearings. When US Ecology objected to further hearings, Dr. Coye advised that she and Gould intended to abide by their agreement with the Senate Rules Committee. In its response in this court the Senate Rules Committee admits that the agreement is the reason for the proposed hearings and argues that this is a legally proper result of the confirmation process.

(3) In its appearances in this proceeding, by written and oral argument and by declaration, the department has consistently maintained that further hearings are not needed and are legally unnecessary. The department urged this court to issue a stay of further hearings and to consider the matter on petition for extraordinary relief. It asserts that further hearings are not required by the Radiation Control Law and invites this court to determine whether the purported agreement with the Senate Rules Committee is void. As Secretary Gould put it in his declaration: "Although, I do not believe that

an additional hearing would be needed to enable the Department to make an informed decision regarding US Ecology's license application, nor do I believe that one is legally required, I seek guidance from the Court as to how to proceed. I will take whatever action the Court concludes is legally required."

The Senate Rules Committee asserts that the validity of the agreement for further hearings presents a nonjusticiable political question. It emphasizes its view that the agreement was not coerced but was simply the result of negotiation between the legislative and executive branches of government. The claim that the agreement was not coerced is somewhat disingenuous in view of the carrot-and-stick approach used by the Senate Rules Committee in the confirmation hearings.[17] But that is not a determinative point since an executive officer's assent to an unconstitutional act will not shield it from judicial review. (See *INS* v. *Chadha* (1983) 462 U.S. 919, 942, fn. 13 [77 L.Ed.2d 317, 339, 103 S.Ct. 2764].)

In support of its claim that this presents a nonjusticiable political question, the Senate Rules Committee relies upon a statement from *Baker* v. *Carr* (1962) 369 U.S. 186, at page 217 [7 L.Ed.2d 663, 686, 82 S.Ct. 691]: "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department . . . or the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government . . . ." The argument is unconvincing. ▬ As the Supreme Court noted in *INS* v. *Chadha, supra,* 462 U.S. at pages 941 and 942 [77 L.Ed.2d at pp. 338-339], a challenge to the constitutionality of an act is inherently a judicial rather than political question and neither the legislature, the executive, nor both acting in concert can validate an unconstitutional act or deprive the courts of jurisdiction to decide questions of constitutionality. (See *Mullan* v. *State* (1896) 114 Cal. 578, 584-586 [46 P. 670].) ▬ As we shall explain, the issues in this case do not involve a political question committed to the determination of the Legislature but instead involve an unconstitutional usurpation of legislative and executive authority by the Senate Rules Committee. Nothing in the political question doctrine requires the judiciary to refrain from addressing the constitutionality of such actions.

We conclude that the agreement with the Senate Rules Committee is unconstitutional and void. The issue is not a close or difficult question. "The

---

[17]The "carrot" was, of course, the promise of a referral of the nominations to the full Senate with a recommendation for approval. The "stick" was the threat to keep the nominations tied up in committee beyond the approaching expiration of the time in which the Senate could act with the resulting automatic loss of employment. (Gov. Code, § 1774, subd. (c)(2).)

powers of State government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.) "The legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly, but the people reserve to themselves the power of initiative and referendum." (Cal. Const., art. IV, § 1.) "The Legislature may make no law except by statute and may enact no statute except by bill. . . ." (Cal. Const., art. IV, § 8, subd. (b).) "Each bill passed by the Legislature shall be presented to the Governor. . . ." (Cal. Const., art. IV, § 10, subd. (a).) The Governor may sign the bill into law, allow the bill to become law without his or her signature, or veto the bill. (Cal. Const., art. IV, § 10.) The Legislature may override a gubernatorial veto by a two-thirds vote in each house. (Cal. Const., art. IV, § 10, subd. (a).)

■ In general it may be said that it is for the Legislature to make public policy and for the executive to carry out the policy established by the Legislature. ■ In practice the complexity of public business necessitates that many of the functions of government be accomplished by administrative agencies. (See *Ray* v. *Parker* (1940) 15 Cal.2d 275, 291 [101 P.2d 665].) Administrative agencies are part of the executive branch of government. (*People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 630-632 [268 P.2d 723].) This is true of the department (Health & Saf. Code, §§ 100-102; Gov. Code, §§ 11150, 12803), and of the Health and Welfare Agency (Gov. Code, §§ 12803, 12806, 12850 et seq.). Although administrative agencies may not exercise complete legislative or judicial powers (*Laisne* v. *Cal. St. Bd. of Optometry* (1942) 19 Cal.2d 831, 835 [123 P.2d 457]), they may be empowered to exercise limited legislative or judicial powers which are often described with the modifier "quasi" to denote their limited nature (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 142 [93 Cal.Rptr. 234, 481 P.2d 242]; *Ray* v. *Parker, supra,* 15 Cal.2d at pp. 291-292). So long as the scope of an agency's powers is properly defined and limited by the Legislature and the exercise of those powers is subject to appropriate judicial review, the exercise of limited legislative and judicial powers by an administrative agency does not offend the Constitution. (*Ray* v. *Parker, supra,* 15 Cal.2d at pp. 291-292.)

■ Within this scheme of things, the Legislature declares public policy and makes provision for the ways and means of its accomplishment, while carrying out those declared policies is an administrative or executive function. (*Lincoln Property Co. No. 41, Inc.* v. *Law* (1975) 45 Cal.App.3d 230, 234 [119 Cal.Rptr. 292]; *Valentine* v. *Town of Ross* (1974) 39 Cal.App.3d 954, 957-958 [114 Cal.Rptr. 678]; *Reagan* v. *City of Sausalito* (1962) 210

Cal.App.2d 618, 621-622 [26 Cal.Rptr. 775]; *McKevitt* v. *City of Sacramento* (1921) 55 Cal.App. 117, 124 [203 P. 132].) The Legislature may, by statute, exercise broad control over the policies to be implemented and the ways and means of their accomplishment. However, acts which are done to carry out the policies and purposes already declared by the Legislature are not a legislative function. (*Ibid.*)

 With respect to low-level radioactive waste disposal, our Legislature has declared the public policy of this state. Among other things that policy is that this state will serve as the host state under the Southwestern Compact and will cause a regional disposal facility to be developed on a timely basis. (Health & Saf. Code, § 25878, art. 4, subd. (E).) The department is charged with responsibility for carrying out this policy and in doing so is required to determine whether to issue a license for the operation of the regional facility. In determining whether to issue a license, the department must accord an opportunity for a hearing on the record to any interested person. (Health & Saf. Code, § 25845, subd. (a).)

In requiring that interested third parties be accorded an opportunity for a hearing, the Legislature declined to require that such a hearing be conducted in accordance with formal APA-type procedures. (Health & Saf. Code, § 25845, subd. (a).) With respect to administrative procedures, a leading authority has observed: "The major malady that cuts deeply into efficiency is grossly excessive use of trial procedure, . . ." (3 Davis, Administrative Law Treatise (2d ed. 1980) § 14.1, p. 3.) It has been observed that "[t]he fact that the provisions of the California Administrative Procedure Act dealing with administrative adjudication are made applicable only to certain State agencies is indicative of the fact that the California Legislature has also recognized that different problems require different procedures. . . ." (48 Ops.Cal.Atty.Gen. 117, 122 (1966).) By declining to require formal APA-type hearings in Health and Safety Code section 25845, subdivision (a), the Legislature necessarily left the character of the hearings and the procedures which would be applicable to the discretion of the department. (See *Vermont Yankee Nuclear Power Corp.* v. *NRDC* (1978) 435 U.S. 519, 543 [55 L.Ed.2d 460, 479, 98 S.Ct. 1197]; *Federal Comm'n* v. *Broadcasting Co.* (1940) 309 U.S. 134, 138 [84 L.Ed. 656, 659, 60 S.Ct. 437].)

By injecting itself into the process and in attempting to force the department to conduct the type of hearings it desired, the Senate Rules Committee usurped to powers of not one but two branches of government. The Senate Rules Committee is one committee of one house of the Legislature. Its authority is subsidiary and auxiliary to the legislative functions of the

Senate. (Cal. Const., art. IV, § 11; *Swing* v. *Riley* (1939) 13 Cal.2d 513, 518 [90 P.2d 313].)[18] And, of course, a single house is not the Legislature. (Cal. Const., art. IV, § 1; *Special Assembly Int. Com.* v. *Southland* (1939) 13 Cal.2d 497, 498 [90 P.2d 304].) The Legislature cannot constitutionally delegate legislative authority to one house and certainly cannot delegate its authority to a committee. (Cal. Const., art. IV, §§ 1, 8, subd. (b); see *INS* v. *Chadha, supra,* 462 U.S. at pp. 955-957 [77 L.Ed.2d 317, 347-348].) To do so would violate the bicameral and presentment clauses of our Constitution. (Cal. Const., art. IV, §§ 1, 8, subd. (b), § 10, subd. (a); see *Legislature* v. *Reinecke* (1972) 6 Cal.3d 595, 601 [99 Cal.Rptr. 481, 492 P.2d 385]; *Mullan* v. *State, supra,* 114 Cal. at pp. 584-586; *People* v. *Toal* (1890) 85 Cal. 333, 336-337 [24 P. 603]; see also *MWAA* v. *Caan* (1991) 501 U.S. __, __ [115 L.Ed.2d 236, 258-259, 111 S.Ct. 2298.) ▮ Here, the Legislature did not purport to delegate supervisory authority over the Radiation Control Law to the Senate Rules Committee; instead, the committee assumed that power for itself. In doing so the committee acted without legislative authorization and in a manner which would be unconstitutional and void even if the Legislature had purported to delegate such authority.

The action of the Senate Rules Committee also usurped the power of the executive in violation of the separation of powers provision of our Constitution. (Cal. Const., art. III, § 3.) ▮ The legislative prerogative is to declare public policy and to provide the ways and means of its accomplishment. (*Lincoln Property Co. No. 41, Inc.* v. *Law, supra,* 45 Cal.App.3d at p. 234; *Valentine* v. *Town of Ross, supra,* 39 Cal.App.3d at pp. 957-958.) Having enacted a statutory scheme, the Legislature has no power to exercise supervisorial control or to retain for itself some sort of "veto" power over the manner of execution of the laws. (*State Board of Education* v. *Levit* (1959) 52 Cal.2d 441, 461-462 [343 P.2d 8]; see also *Bowsher* v. *Synar* (1986) 478 U.S. 714, 726-727 [92 L.Ed.2d 583, 596-597, 106 S.Ct. 3181]; *INS* v. *Chadha, supra,* 462 U.S. at pp. 954-955 [77 L.Ed.2d at pp. 346-347].) ▮ In other words, having granted authority to the department to execute the provisions of the Radiation Control Law, the Legislature "must abide by its delegation of authority until that delegation is legislatively altered or revoked" by statute in accordance with the bicameral and presentment requirements of our Constitution. (*INS* v. *Chadha, supra,* 462 U.S. at pp. 954-955 [77 L.Ed.2d at p. 347]; see *Mullan* v. *State, supra,* 114 Cal. at pp. 584-586.)

---

[18]The Senate Rules Committee has one direct constitutional function, that is, it appoints two public members to an advisory committee which consults with the Governor in the selection of the Regents of the University of California. (Cal. Const., art. IX, § 9, subd. (e).) In other respects the authority of the Senate Rules Committee is derivative and dependent. (*Swing* v. *Riley, supra,* 13 Cal.2d at p. 518.)

The Senate Rules Committee asserts that the director and secretary's agreement to conduct formal adjudicatory hearings was the result of a legally proper compromise during the confirmation process. It is mistaken. As we have noted, the authority of the Senate Rules Committee is subsidiary and auxiliary to the functions of the Senate, and the committee cannot exercise the prerogatives of the Senate. (Cal. Const., art. IV, § 11; *Swing* v. *Riley*, *supra*, 13 Cal.2d at p. 518.) Even if we concluded that the Senate could exact an agreement from gubernatorial nominees, it would not follow that the Senate Rules Committee could exercise such power.

■ In any event, the Senate has no such power. The Secretary of the Health and Welfare Agency and the Director of the Health Services are executive officers who are appointed by and hold office at the pleasure of the Governor. (Health & Saf. Code, § 101; Gov. Code, §§ 1322, subd. (8), 12800-12801.) The appointments are subject to confirmation by the Senate. (*Ibid.*) However, the Senate's role in the process is limited to approving or refusing to approve the nomination; upon voting to confirm a nominee the Senate's power is spent and it cannot exercise supervisorial control over the nominee's performance of the duties of office. (Gov. Code, §§ 1774, 1774.1.) Nothing in the process suggests that the Senate can exact promises or agreements from nominees as to the manner of performance of their duties. Rather, our Constitution provides an oath which, among things, requires that officers swear or affirm to well and faithfully discharge the duties of office. (Cal. Const., art. XX, § 3.) The Constitution provides: "And no other oath, declaration, or test, shall be required as a qualification for any public office or employment." (*Ibid.* See also Gov. Code §§ 1364-1365.) The Legislature can, of course, dictate the manner of execution of the laws by enacting a statute in accordance with the bicameral and presentment requirements of our Constitution, but it cannot otherwise exercise supervisorial control over the performance of the duties of an officer. (See *Mullan* v. *State*, *supra*, 114 Cal. at pp. 584-586; *Bowsher* v. *Synar*, *supra*, 478 U.S. at pp. 726-727 [92 L.Ed.2d at pp. 596-597].)

■ We finally address the claim of the Senate Rules Committee that although the agreement for further hearings originated with the committee, inclusion of funds for the proposed hearings in the Budget Act validated the agreement. Insofar as the Governor is concerned, his request for and approval of funding for the proposed hearings does not represent a shift in his consistent position that the agreement was unlawful and the hearings unnecessary. It would be foolhardy for an executive officer to fail to plan for contingencies, and that is all the Governor has done. In any event, the Governor can no more concede executive power to a legislative committee

than a committee can be permitted to usurp it. (*State Board of Education* v. *Levit, supra*, 52 Cal.2d at p. 461; 1 Cooley's Constitutional Limitations (8th ed. 1927) p. 215.) And the Governor's consent to an unlawful legislative act does not validate the act. (*Mullan* v. *State, supra*, 114 Cal. at p. 584; see *INS* v. *Chadha, supra*, 462 U.S. at p. 942, fn. 13 [77 L.Ed.2d at p. 339].)

So far as the Legislature is concerned, an appropriation for the proposed hearings is ineffectual to legitimate the actions of the Senate Rules Committee. The Legislature cannot ratify an exercise of authority by a committee which it could not lawfully delegate to the committee in the first instance. (See Cal. Const. art. IV, §§ 1, 8; *MWAA* v. *Caan, supra*, 501 U.S. __ [115 L.Ed.2d at pp. 258-259]; *INS* v. *Chadha, supra*, 462 U.S. at pp. 955-957 [77 L.Ed.2d at pp. 347-349].) And an appropriation in the Budget Act cannot be considered an amendment of Health and Safety Code § 25845, subdivision (a), by which authority over licensing hearings was granted to the department. (See *Board etc. Commrs.* v. *Riley* (1924) 194 Cal. 37, 41-44 [227 P. 775]; *Riley* v. *Forbes* (1924) 193 Cal. 740, 749 [227 P. 768]; *Railroad Commission* v. *Riley* (1923) 192 Cal. 54, 59 [218 P. 415].)

## II. *Are Petitioners Entitled to Relief?*

The petitioners assert that further adjudicatory proceedings in a formal mode are legally prohibited and the department must act on US Ecology's license application. The Senate Rules Committee asserts that even if the department is not legally required to conduct further adjudicatory hearings, such hearings are permissible in the department's discretion. We conclude that it is unnecessary and in fact inappropriate to consider these issues at this time.

It is clear that the department has not chosen to require further hearings in a formal adjudicatory mode in the exercise of administrative discretion, but has simply deferred to the agreement forced upon the director and secretary by the Senate Rules Committee. An executive or administrative officer can no more abdicate responsibility for executing the laws than the Legislature can be permitted to usurp it. ▇▇▇ Nominees to public office cannot be permitted to waive their executive independence or consent to legislative supervision because our constitutional provisions serve important public policies beyond the interests of the nominees. (See *Commodity Futures Trading Comm'n* v. *Schor* (1986) 478 U.S. 833, 850-851 [92 L.Ed.2d 675, 692-693, 106 S.Ct. 3245].) In short, a public officer cannot be excused from performing the duties of his or her office, including exercising discretion where an exercise of discretion is required. (*State Board of Education* v.

*Levit, supra,* 52 Cal.2d at p. 461; 1 Cooley's Constitutional Limitations, *supra,* p. 215.)

■■■ We have seen that where an administrative agency or executive officer is vested with discretion in the execution of the laws it is the agency or officer that must exercise discretion. Mandate will not lie to control the exercise of executive discretion. "Mandate is, nonetheless, appropriate to compel an officer both to exercise his discretion and to exercise it under a proper interpretation of the applicable law." (*Anderson* v. *Phillips* (1975) 13 Cal.3d 733, 737 [119 Cal.Rptr. 879, 532 P.2d 1247]; *Hollman* v. *Warren* (1948) 32 Cal.2d 351, 354-355 [196 P.2d 562].) In *Hollman* the petitioner sought appointment as a notary public but the Governor refused to make the appointment based upon an unconstitutional legislative limitation. The petitioner was not entitled to a writ of mandate to compel her appointment but she was entitled to a writ to compel the Governor to exercise his discretion free from the unconstitutional limitation.

A similar result was reached in *State Board of Education* v. *Levit, supra,* 52 Cal.2d at page 466. Levit, as Director of Finance, was the state executive officer charged with approval and supervision of textbook printing orders of the State Board of Education. The board adopted certain elementary school textbooks and secured a contractual license to print them. However, in an item in the Budget Act the Legislature had provided that the moneys appropriated for textbooks were not to be used for the textbooks adopted by the board. The director refused to approve the printing of the textbooks. Correspondence between the parties established that originally the budget item restriction was the director's sole reason for refusing to print the textbooks. In his return to the alternative writ of mandate the director took the further position that the licensing contracts had not been submitted to him for approval pursuant to the Government Code, although by law and practice the director could except the contracts from that requirement. The Supreme Court concluded that the budget item restriction was an unconstitutional legislative interference with the authority of the Board of Education. Since it was clear that the budget item restriction was the sole reason for the director's action, the court determined that a writ of mandate should be issued. However, in view of the position later taken by the director, the writ was limited to require consideration of the printing requisition without regard to or consideration of the invalid budget item restriction.

A similar result is appropriate here. It is clear that the invalid agreement with the Senate Rules Committee is the sole reason the department has ordered further hearings of a formal nature. The department concedes that it

does not believe further hearings are needed or legally required and asserts only that it desires to comply with the law. The parties and the public are entitled to have the department exercise its discretion with respect to the application of US Ecology. In short, the law requires the department to execute the provisions of the Radiation Control Law without interference from the Senate Rules Committee and without regard to the invalid agreement imposed upon the director and secretary.

To go further in this case is unwarranted. We have noted that in Health and Safety Code section 25845, subdivision (a), the Legislature left the character of licensure proceedings to the discretion of the department. The department has not exercised discretion to reopen the hearings, but has simply deferred to the void agreement with the Senate Rules Committee. In the absence of an actual exercise of discretion in concrete circumstances, a further decision of this court would constitute a mere advisory opinion and could itself unduly interfere with the department's discretion. We deem it appropriate to adhere to the procedure set forth in *State Board of Education v. Levit, supra,* 52 Cal.2d at page 466, that is, we will grant extraordinary relief requiring the department to proceed with consideration of US Ecology's license application without regard to or consideration of the invalid agreement with the Senate Rules Committee.

## DISPOSITION

Let a peremptory writ of mandate issue requiring the respondents to set aside their order for further administrative hearings and to proceed with consideration of the application of US Ecology, Inc., for a low-level radioactive waste disposal license, without regard to or further consideration of the void agreement with the Senate Rules Committee. The alternative writ having served its purpose is discharged. The stay previously issued is vacated with the finality of this decision.

Puglia, P. J., and Raye, J., concurred.

A petition for a rehearing was denied June 2, 1993, and the petition of real party in interest for review by the Supreme Court was denied August 24, 1993. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.